United States Court of Appeals
Fifth Circuit

**F I L E D**

September 2, 2003

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-10605

_____

BILLY LEWIS,

Plaintiff - Appellee/Cross - Appellant,

VERSUS

BANK OF AMERICA NA, Etc; ET AL,

Defendants,

BANK OF AMERICA NA, formerly known as Nationsbank of Texas NA;
MARK THOMASON; WALTER F. SMITH, JR.; SALLY WALTERS,

Defendants - Appellants/Cross - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before: DAVIS, CYNTHIA HOLCOMB HALL[*], and EMILIO M. GARZA,
Circuit Judges.

Opinion by Judge Hall; dissent by Judge Garza.

HALL, Circuit Judge:

_____

[*]U.S. Circuit Judge, Ninth Circuit, sitting by designation.

Bank of America, formerly known as NationsBank of Texas ("the Bank"), and its former employee, Mark Thomason, appeal a jury verdict holding them jointly liable for fraud and breach of contract and awarding damages of $380,101.75 to Billy Lewis. Lewis cross-appeals, arguing that the jury instructions improperly limited the scope of compensable damages. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we REVERSE.

**FACTS**

### 1. *Billy Lewis's Defined Benefit Plans*

Billy Lewis was employed by the General Cable Corporation ("General Cable") from 1958 to 1992.[1] During his employment with General Cable, Lewis participated in the General Cable 401(k) defined benefit retirement savings plan, accumulating a balance of $96,200.71. In 1986, Lewis founded the Billy Lewis Sales Company, a plastics trading business. In connection with this

---

[1]Prior to 1988, General Cable was known as "Capital Wire and Cable Corporation."

business, Lewis created a second defined benefit plan.  By 1991,

Lewis had accumulated a balance of approximately $428,000 in his

Billy Lewis Sales Company defined benefit plan.

## 2.    *Loan Negotiations Between Lewis and the Bank*

In 1992, Lewis's son started Eau De Vie., Inc., a wholesale

and retail liquor business operating as "Spirits Liquor."  In

order to help his son's new business obtain financing, Lewis

contacted the Bank to discuss the possibility of a $100,000 loan.

The Bank arranged a meeting at the Spirits Liquor facility

between Lewis and loan officer Mark Thomason.  During this

meeting, Lewis offered to pledge either the Spirits Liquor

inventory or his personal land holdings as collateral.  Thomason

rejected both suggestions, and informed Lewis that the Bank would

be willing to execute the proposed loan only on a cash-secured

basis.  Thomason proposed that Lewis liquify his defined benefit

holdings and place the funds into CDs at the Bank.[2]  Thomason

told Lewis that, by doing so, the funds could be used as

---

[2] Lewis contends that Thomason told him that his funds would
be placed into tax-deferred IRA CDs.  Thomason denies making such
a representation.

collateral for a loan at the rate of two percent over the rate of return on the CD.

Lewis agreed to the terms offered by Thomason, and entered into a written loan agreement with the Bank. The documents forming the written loan agreement between Lewis and the Bank included a letter requiring Lewis to secure the loan with collateral "in a form satisfactory" to the Bank. Between December 10, 1992, and January 21, 1993, Lewis transferred a total of $528,496.76 from his Billy Lewis Sales Company defined benefit plan to the Bank. On January 4, 1993, the Bank issued a $100,000 loan to Lewis for the Spirits Liquor business. Shortly thereafter, the Bank agreed to provide additional financing to Spirits. By January 28, 1993, the loan balance was $528,000. On August 12, 1993, Spirits Liquor sought an additional $100,000 loan to cover an overdraft on the company's checking account. Lewis agreed to secure the loan by transferring funds to the Bank from his General Cable 401(k) plan. Between August 19, 1993, and October 5, 1993, Lewis withdrew a total of $96,200.71 from his General Cable 401(k) plan and used the funds to purchase CDs at

-4-

the Bank.

Lewis maintained the CDs until 1996, when Spirits Liquor concluded its relationship with the Bank.  Lewis redeemed the CDs at that time, using the proceeds to satisfy the outstanding balance on the Spirits Liquor loans.

## 3.    *Tax Consequences of the Spirits Liquor Loans*

In early 1994, Lewis's accountant Bud Lowry discovered a series of 1099 tax forms characterizing Lewis's 1992 and 1993 withdrawals from his Billy Lewis Sales Company and General Cable 401(k) retirement plans as taxable income.  Lowry immediately contacted the Bank to request written documentation that the funds had been transferred to tax-deferred IRA accounts at the Bank.  The Bank refused the request, and notified Lowry that Lewis's funds were held in non-IRA CDs.  Lowry's subsequent attempts obtain documents designating Lewis's accounts as IRA CDs were similarly unsuccessful.  When Lewis filed his 1993 tax return, he did not declare the withdrawals from his defined benefit plans as income.

In the Spring of 1996, Lewis received a notice of deficiency

from the IRS in the amount of approximately $700,000.[3]

Subsequent negotiations between the IRS and Lewis's accountants ultimately resulted in a settlement reducing Lewis's liability to $323,000.

## 4. *Procedural History of the Instant Lawsuit*

On August 1, 1996, Lewis filed a complaint in Dallas County District Court. On December 4, 1996, Lewis amended his complaint to allege, inter alia, that the Bank was a custodian of Lewis's defined benefit plan. On January 2, 1997, the defendants removed the action to federal court on the grounds that the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA") created federal question jurisdiction. Lewis subsequently amended the complaint to specifically state claims arising under ERISA.

On March 11, 2002, a jury trial commenced in the District Court for the Northern District of Texas. At the conclusion of

---

[3]The $700,000 notice of deficiency contained several items related to the Spirits Liquor loan, and several unrelated items. The percentage attributable to the Spirits Liquor loan is not clear from the record.

Lewis's case in chief, Lewis withdrew his ERISA claims.  The

defendants rested their case, and moved for judgment as a matter

of law as to all claims.  The district court denied the motion as

to the Bank and Thomason, granted the motion as to Bank employees

Walter Smith and Sally Walters, and submitted Lewis's fraud and

breach of contract claims to the jury.

The jury entered a verdict in favor of Lewis on March 14,

2002.  The district court entered judgment on March 29, 2002.  On

April 8, 2002, the Bank and Thomason renewed their motion for

judgment as a matter of law.  On April 9, 2002, the district

court denied the motion and entered an amended final judgment.

Defendants timely appealed.

## STANDARD OF REVIEW

We review a district court's ruling on a Rule 50 motion for

judgment as a matter of law de novo.  Delano-Pyle v. Victoria

County, 302 F.3d 567, 572 (5th Cir. 2002).  Where, as here, an

appellant has fully complied with Rule 50, we review a jury

verdict for sufficiency of the evidence.  Id.

## ERISA PREEMPTION

-7-

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  Although the term "relate to" is intended to be broad, "pre-emption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability."  New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661 (1995) (internal citation and quotation omitted).

Where, as here, the facts underlying a state law claim bear some relationship to an employee benefit plan, our task is to evaluate the nexus between the state law and ERISA, in view of ERISA's statutory objectives.  Travelers, 514 U.S. at 656.  Relevant statutory objectives include establishing uniform national safeguards "with respect to the establishment, operation, and administration of [employee benefit] plans," 29 U.S.C. 1001(a), and "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. 1001(b).  Lewis's fraud and contract

-8-

claims against the Bank, a non-fiduciary,[4] and its employees bear little relationship to these objectives. Congress clearly did not intend to broadly immunize non-fiduciary parties such as the Bank from liability under traditional state law contract and tort causes of action. The district properly determined that Lewis's claims were not preempted.

## BREACH OF CONTRACT

At trial, Lewis argued that the Bank breached an oral contract to place Lewis's funds in tax-deferred IRA CDs. The elements of a breach of contract claim under Texas law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach. Palmer v. Espey Huston & Assocs., 84 S.W.3d 345, 353 (Tex. App. 2002). The jury entered a verdict in favor of Lewis on the contract claim, finding that the Bank had "agreed to place the funds from the Billy Lewis Sales Company Defined Benefit Plan

_____

[4]Lewis does not challenge the district court's ruling that neither Thomason nor the Bank was a fiduciary.

-9-

[and 401(k) plan] in tax-deferred IRA CDs."  On appeal, the Bank contends that the breach of contract claim should not have been submitted to the jury because Lewis did not present evidence that he suffered damages as a result of the alleged breach.

Pursuant to 26 U.S.C. § 408, if an individual pledges an IRA "as security for a loan, the portion so used is treated as distributed to that individual" and is taxed accordingly.  26 U.S.C. § 408(e)(4).  Pledging IRA funds as security for a loan thus has the same tax effect as withdrawing the same funds from an IRA and investing them in non-IRA CDs.  Accordingly, the Bank correctly observes that performance of the alleged contract to place Lewis's funds in an IRA account would have created precisely the same mandatory tax consequences as the Bank's alleged breach.  Because a causal link to economic damages is a requisite element of an action for breach of contract, the district court erred by submitting the contract claim to the jury.

### FRAUDULENT INDUCEMENT

At trial, Lewis argued that the defendants fraudulently

induced him "to withdraw funds from the Billy Lewis Sales Company Defined Benefit Plan [and 401(k) plan] and place it [sic] in non-tax deferred CDs."  The jury entered a verdict in Lewis's favor.

The elements of a fraudulent inducement claim are: 1) a material misrepresentation was made; 2) when the misrepresentation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; 3) the speaker made the misrepresentation with the intent that the other party should act on it; 4) the plaintiff detrimentally relied on the misrepresentation.  In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001).

In order for a reasonable jury to have concluded that the Bank committed fraud, the jury must have identified a material misrepresentation by the Bank.  Lewis's counsel suggested in his closing argument that the relevant misrepresentation was the Bank's alleged statement that it would place Lewis's funds into IRA CDs. If this was the relevant misrepresentation, however, Lewis's fraud claim suffers from a similar defect as his contract claim.  As noted above, a pledge of IRA funds as collateral for a loan is

-11-

treated as a premature withdrawal and renders such funds taxable. 26 U.S.C. § 408(e)(4). Accordingly, any misrepresentation as to whether Lewis's funds would be deposited in IRA CDs, as opposed to regular CDS, had no practical consequence and was therefore immaterial. See Gen. Am. Life Ins. Co. v. Martinez, 149 S.W.2d 637, 641 (Tex. App. 1941)("One could hardly be said to rely on an immaterial misrepresentation. If he does, he is not entitled to relief.").[5]

Lewis also argues that the Bank misrepresented its ability to shelter Lewis from taxes and early withdrawal penalties. As we

---

[5]The dissent takes the position that the materiality of a representation should be determined solely by reference to its effect on the recipient. The dissent correctly observes that, under Texas law, a representation cannot be deemed "material" if it has no effect on the plaintiff's actions. See Manges v. Astra Bar, Inc., 596 S.W.2d 605, 611 (Tex. App. 1980) ("In order to show materiality, proof must be made that the misrepresentation induced the complaining party to act."). It does not follow, however, that a plaintiff's decision to react to an otherwise inconsequential representation renders that representation *per se* material. As Texas courts have recognized, "reliance on a misrepresentation is distinct from the materiality thereof, although the distinction may not at all times be clear." Gen. Am. Life Ins. Co. v. Martinez, 149 S.W.2d 637, 641 (Tex. App. 1941).

have previously noted, mere failure to disclose information is not actionable "misrepresentation" under Texas law, absent a fiduciary relationship.  Mitchell Energy Corp. v. Samson Resources Co., 80 F.3d 976, 985 (5th Cir. 1996) (citing Tempo Tamers, Inc. v. Crow-Houston Four, Ltd., 715 S.W.2d 658, 669 (Tex. App. 1986)). Therefore, Lewis had the burden of proving not only that the Bank failed to disclose the tax consequences of pledging his funds as collateral, but also that the Bank actively misrepresented such consequences, and did so either intentionally or recklessly. Moreover, Lewis bore the burden of proving that he justifiably relied on any such misrepresentation.

The sole piece of evidence that the Bank affirmatively misrepresented the tax consequences of the proposed transaction was the following exchange between Lewis and his attorney:

Q (Lewis's Attorney): Okay, in that initial conversation [with Thomason], did you ask him, will this remain in a tax-exempt status?

A (Lewis): Yes, I did.

Q: And what did he say?

A: He assured me that it would.

-13-

Lewis provided no further details about the context of the exchange or the specific nature of Thomason's "assurance." Because Lewis's testimony omitted critical details such as the specific nature of both his inquiry and Thomason's response, it is not clear whether the parties were discussing the tax consequences of the loan transaction as a whole. Notably, Lewis did not testify that Thomason told him that his retirement funds could be pledged as collateral without incurring taxes or penalties. Certainly, Lewis did not testify that Thomason represented an ability to circumvent the Internal Revenue Code, which treats IRA pledges as taxable withdrawals. A fraud claim should not be submitted to a jury unless the plaintiff has presented more than a mere scintilla of evidence that the defendant intentionally or recklessly made a material misrepresentation of fact. FirstMerit, 52 S.W.3d at 758. Lewis's conclusory testimony regarding a single, ambiguous statement by Thomason was insufficient to meet this minimum standard.

Common law fraud, moreover, requires a plaintiff to show not only that a misrepresentation was made, but also that he or she

-14-

justifiably relied on the alleged misrepresentation.  <u>Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.</u>, 51 S.W.3d 573, 577 (Tex. 2001).  The "justifiable reliance" element of common law fraud does not require a plaintiff to demonstrate reasonableness.  <u>Field v. Mans</u>, 516 U.S. 59, 70-71 (1995) (citing Restatement (Second) of Torts § 545A, comment *b*).  However, a fraud plaintiff "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  <u>Id</u>. at 71 (citing Restatement  § 541, comment *a*).  Moreover, a person may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted."  <u>In re Mercer</u>, 246 F.3d 391, 418 (5th Cir. 2001) (applying the "justifiable reliance" fraud standard in the federal bankruptcy setting).

The record is devoid of evidence that Lewis perceived Thomason, a loan officer, to be an expert in tax law or investment planning.  Nonetheless, according to Lewis's testimony, he blindly relied on Thomason's oral "assurance" by transferring more than $600,000 in funds to the Bank, without requesting written

-15-

confirmation or consulting with a tax or investment professional.

Following his meeting with Thomason, Lewis received a letter from the Bank summarizing the proposed loan transaction, stating that the collateral must be "in a form acceptable to" the Bank, and making no reference to sheltering Lewis from the tax consequences of the transaction. Subsequently, Lewis signed and executed a series of loan documents, each of which listed his CDs as collateral, and none of which characterized the CDs as IRAs or as tax-deferred. Lewis, an individual with both a business background and familiarity with retirement accounts, should have viewed this series of events as a red flag warranting further investigation of the tax consequences of the loan transaction. Viewing the circumstances in their entirety, including Lewis's access to professional accountants,[6] the amount of money involved in the transaction, and the ambiguous nature of Thomason's "assurance," Lewis's decision to enter into the transaction without undertaking

_____

[6]Our review of the record indicates that Lewis had access to tax professionals during all relevant time periods. Indeed, Lewis and his CPA, Bud Lowry, met with Bank officials during the time period between the original $528,000 loan and the subsequent $100,000 loan.

-16-

additional investigation into its tax consequences was not justifiable. Accordingly, a reasonable jury could not have found that Lewis actually and justifiably relied on any misrepresentation by the Bank. The district court erred by submitting the fraudulent inducement claim to the jury.

## CONCLUSION

Lewis failed to present sufficient evidence in support of his breach of contract and fraudulent inducement claims.[7] We REVERSE the judgment in its entirety, and direct the district court to enter judgment in favor of Appellants.

---

[7]Because we reverse the judgment in its entirety, we need not address Lewis's contention that the jury verdict improperly limited the jury's consideration of damages. Similarly, we need not address the Bank's additional objections to the verdict form, entry of judgment, and Lewis's closing argument.

EMILIO M. GARZA, Circuit Judge, dissenting in part:

Although I agree with the majority that Billy Lewis ("Lewis") failed to present sufficient evidence in support of his breach of contract claim against Bank of America ("the Bank"), I do not agree that Lewis failed to present sufficient evidence in support of his fraudulent inducement claim.

Contrary to the majority opinion's conclusion, a reasonable jury could have determined that Lewis presented sufficient evidence on every element of his fraudulent inducement claim. *See In re Firstmerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001)(elements of fraudulent inducement). From the evidence presented at trial, a reasonable jury could have concluded that the Bank, through its loan officer, Mark Thomason ("Thomason"), falsely assured Lewis that it could accept retirement funds withdrawn from Lewis' defined benefit plan and 401(k) as collateral for a loan, and that those funds would retain their tax-deferred status; that this representation, made by Thomason in his initial conversation with Lewis, was false; that Thomason was at least reckless as to the truth of this representation; that the representation was made with the intent that Lewis should act on it by transferring his retirement funds to the Bank; that Lewis transferred his retirement funds to the Bank; that, but for Thomason's representation, Lewis would not have transferred his retirement funds to the Bank; and that, as a direct result of his transferring funds from tax-deferred instruments into non-tax-deferred CDS at the Bank, Lewis was injured.

The majority opinion reasons that Lewis failed to present evidence from which a reasonable

jury could have concluded that the Bank made a "material misrepresentation." *See In re Firstmerit Bank*, 52 S.W.3d at 758. According to the majority opinion, the relevant misrepresentation))the Bank's alleged statement that Lewis' funds would be placed in tax-deferred IRA CDs))was immaterial solely because pledging IRA funds as collateral for a loan is treated as a premature withdrawal and renders such funds taxable. It reasons that "any misrepresentation as to whether Lewis's funds would be deposited in IRA CDS, as opposed to regular CDS, had no practical consequence and was therefore immaterial." I disagree. The relevant inquiry concerning the materiality of the alleged misrepresentation is whether, from the evidence presented, a reasonable jury could have concluded that Lewis would not have signed the loan agreement (thereby pledging funds withdrawn from his defined benefit plan and 401(k) as collateral) if Thomason had not represented to Lewis that the funds would be placed in tax-deferred instruments. *See Broaddus Co. v. Binkley*, 126 Tex. 374, 88 S.W.2d 1040, 1042-43 (1936)(reasoning that the test as to whether representations made by a broker to procure the execution of a contract constituted a "material inducement" was whether the contract would have been signed without such representations having been made).[8]

_____

[8] *See also Manges v. Astra Bar, Inc.*, 596 S.W.2d 605, 611 (Tex. Civ. App.))Corpus Christi 1980, writ ref'd n.r.e. ) ("In order to show materiality, proof must be made that the misrepresentation induced the complaining party to act."); *Sawyer v. Pierce*, 580 S.W.2d 117, 124 (Tex. Civ. App.))Corpus Christi 1979, writ ref'd n.r.e.) ("In order to make [the misrepresentation] material, proof must be made that it induced the complaining party to enter into the contract."). *See generally Askew v. Smith*, 246 S.W.2d 920, 923 (Civ. App. Tex.))Dallas 1952, no writ) (explaining that, where one of the parties to a contract takes advantage of the
(continued...)

-19-

Lewis' testimony supports that he would not have signed the loan agreement if Thomason had not

represented (falsely) to him that his retirement funds would be placed in tax-deferred CDS.  Lewis

testified that Thomason "assured" him that the funds withdrawn from his defined benefit plan and

401(k) would remain in a tax-exempt status, and that, if he had known that these funds would be

taxed if pledged as collateral for the loan, he would not have pledged those funds as collateral in the

first place.[9]  Thus, contrary to the majority opinion's view, Lewis' testimony supports that his reliance

---

[8](...continued)
other party's ignorance of the law by so misrepresenting the law as to induce such
other party to part with rights or property which he might have retained, the
misrepresentation is considered such fraud as to justify a court of equity in giving
relief).

[9]  Lewis testified that, at the time that the money was transferred, he believed
that the money was going into IRA CDs:

Q (Lewis' Attorney): At the time that money was transferred, just so we're
clear on this, you thought it was going to IRA CD's?

A (Lewis): Yes, sir.

Lewis' testimony also supports that, if Lewis had known that the funds would be
taxed if he used them as collateral for the loan, he would not have pledged the funds
as collateral:

Q (Lewis' Attorney): Did anyone at NationsBank – I mean, you were
asked did anybody give you tax advice.  Did anyone at NationsBank
tell you, if you pledge this money as collateral, it will be taxable even if
it's in an IRA?

A (Lewis): No, sir, they did not.

(continued...)

-20-

on Thomason's false "assurance" of tax-exempt status had real financial consequences.  The jury

believed Lewis.  I see no reason why we should second-guess the jury's credibility determination.  *See*

*Mississippi Chemical Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002)(explaining that,

when reviewing the district court's ruling on a motion for judgment as a matter of law, it is our duty

to "draw[] all reasonable inferences and resolv[e] all credibility determinations in the light most

favorable to the non-moving party").

In spite of the jury's decision to believe Lewis' testimony, the majority opinion dismisses as

insufficient the "sole piece of evidence" supporting that the Bank affirmatively misrepresented the tax

consequences of the proposed loan transaction) ) Lewis' "single, ambiguous statement" at trial that

Thomason "assured" him that his retirement funds, once pledged as collateral for the loan, would

remain in a tax-exempt status.  It reasons that, because Lewis' testimony provided no greater detail

---

[9](...continued)
. . .

Q: You were asked if you wanted to provide your son collateral for his business loan, and you said yes.

A: Yes, this is correct.

Q: Would you have provided collateral if you knew it took – changed your IRA to a taxable IRA?

A: Absolutely not. I would not have paid the bank two-percent interest knowing that I had to pay taxes anyhow.  That's ridiculous.

-21-

about the "context of the exchange or the specific nature of Thomason's 'assurance' . . . it is not clear [from Lewis' testimony] whether the parties were discussing the tax consequences of the loan transaction as a whole." The majority opinion is not correct in dismissing so readily Lewis' testimony concerning Thomason's false "assurance." Viewed in context, it is easy to see that Lewis' testimony regarding Thomason's false "assurance" was made in a conversation between Thomason and Lewis related specifically to the placement of Lewis' retirement funds (to be pledged as collateral) into tax-deferred CDS at the Bank. According to Lewis' testimony, in their initial conversation, he and Thomason specifically discussed pledging the securities in Lewis' defined benefit plan as collateral for the loan:

> Q (Lewis' Attorney): [W]hat did [Thomason] say he wanted for collateral?
>
> A (Lewis): Well, I had told him – at that point, I told him I had a . . . defined benefit plan, is the only other thing I had that could be used as liquid collateral, because he was asking for liquid collateral.
>
> . . .
>
> Q: What did [Thomason] say when you told him you had a defined benefit plan?
>
> A: He jumped right on it and said, I'll take it and place it in CD's and charge you two-percent interest.

Lewis also testified that, in that initial conversation, Thomason affirmatively misrepresented the tax consequences of pledging the securities in his defined benefit plan as collateral:

-22-

Q (Lewis' Attorney): Okay.  In that initial conversation [with Thomason], did you ask

him, will this remain in tax-exempt status?

A (Lewis): Yes, I did.

Q: And what did he say?

A: He assured me that it would.

Thus, contrary to the majority opinion's reasoning, it is clear from Lewis' testimony that Thomason

made his "assurance" of tax-exempt status in response to Lewis' question about whether his

retirement funds could be pledged as collateral without incurring taxes.

The majority opinion also reasons that, "[v]iewing the circumstances in their entirety,"

including Lewis' "business background and familiarity with retirement accounts," his "access to

professional accountants," the large amount of money involved in the transaction, and "the ambiguous

nature of Thomason's 'assurance,'" Lewis' decision to enter into the transaction "without

undertaking additional investigation into its tax consequences was not justifiable."  It suggests that

Lewis' fraud claim fails because he "blindly" relied on Thomason's assurance of tax-exempt status,

even though he should have been forewarned by a number of "red flags") ) such as the fact that a

letter he received from the Bank summarizing the proposed loan transaction stated that the collateral

must be "in a form acceptable to" the Bank, but makes no reference to sheltering Lewis from the tax

consequences of the transaction, and the fact that none of the loan documents characterized the CDS

as IRAs or as tax-deferred.

Because the issue of justifiable reliance is a close question in this case, I simply cannot agree with the majority opinion that no reasonable jury could have concluded that Lewis justifiably relied on Thomason's assurance of tax-deferred status. Even assuming that the "red flag" occurrences cited by the majority opinion can be fairly characterized as "red flags," there is nothing in the record which suggests that Lewis' "business background" and/or "familiarity with retirement accounts" made him qualified to recognize these particular "red flags." Lewis is not an expert in tax law or investment planning. Nor is it obvious why a person like Lewis should not be able to trust a bank loan officer's assurance that money transferred to the loan officer's bank will be placed in tax-deferred instruments. A reasonable jury could have concluded that, even though Lewis had access to tax professionals during the relevant time period, Lewis did not know or understand that he would need to call upon those tax professionals to check the veracity of Thomason's assurance to him that the money transferred to the Bank would be placed in tax-deferred instruments. After all, Lewis testified that no person at the Bank ever warned him that, if he pledged this money as collateral, it would be taxable, even if placed in IRA CDS. And, although the letter from the Bank, stating that the collateral must be "in a form acceptable to" the Bank, did not positively confirm that the transferred funds were being placed in tax-deferred instruments, this letter did *not* specifically indicate that the money would be placed in *non*-tax-deferred instruments. Moreover, contrary to the conclusion reached by the majority, it is not obvious that Lewis should have seen it as a "red flag" when the loan documents presented to him did not specifically indicate that the CDS to be pledged as collateral would be tax-

exempt, IRA CDS. Lewis testified that Thomason not only assured him that his retirement funds would be placed in tax-deferred instruments, but also specifically told him that he did not need to sign any "forms" to set up an IRA.[10] Because it was not unreasonable for the jury to infer from the evidence that Lewis justifiably relied on Thomason's "assurance" of tax-exempt status, we should

---

[10] On direct examination, Lewis testified that Thomason told him that he did not need to sign any forms to set up an IRA:

> Q (Lewis' attorney): You were asked if you – and the way the question was asked concerned signing forms. Did you believe that, when your money left the defined benefit plan from Shearson, that it had been transferred into an IRA.
>
> A (Lewis): Yes, I did.
>
> Q: And why did you believe that?
>
> A: Well, because of what I was told [by Thomason].
>
> Q: Did you ask Mr. Thomason where the forms were?
>
> A: Yes, I did.
>
> Q: Did he tell you, there are no forms coming?
>
> A: Eventually, that was his last statement, yes.
>
> . . .
>
> Q: I'm sorry. At that time, what did he tell you precisely?
>
> A: He said, I've checked into it, and there's – there are no forms that you need to sign.

refrain from overturning its verdict on this ground. *See Richter v. Bank of America*, 939 F.2d 1176, 1187 (5th Cir. 1991)(deferring to the jury's reasonable inferences from the evidence in a case where the justifiable reliance issue was "close").

For the foregoing reasons, I do not agree with the majority's decision to reverse the judgment in its entirety. I fear that, in concluding that Lewis failed to present sufficient evidence in support of his fraudulent inducement claim, the majority has lost sight of our traditionally deferential standard of review for jury verdicts, as well as our duty to "draw[] all reasonable inferences and resolv[e] all credibility determinations in the light most favorable to the non-moving party" when reviewing the district court's ruling on a motion for judgment as a matter of law. *Mississippi Chemical Corp.*, 287 F.3d at 365. I, therefore, respectfully dissent.