Opinion filed May 29, 2015



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00212-CV

_____

## NASSER SHAFIPOUR, Appellant

## V.

## RISCHON DEVELOPMENT CORPORATION, Appellee

**On Appeal from the 96th District Court**

**Tarrant County, Texas**

**Trial Court Cause No. 096-236499-09**

## M E M O R A N D U M   O P I N I O N

This appeal arises out of an alleged breach of an oral agreement between Rischon Development Corporation and Nasser Shafipour, individually, to develop a tract of land in Haltom City, Texas, which was owned by NMV, Inc. Rischon sued Shafipour for breach of contract, breach of partnership, breach of fiduciary duty, fraud, and negligent misrepresentation, along with quasi-contractual claims. At trial, the jury found that Rischon performed compensable work for Shafipour and that $16,500 was the reasonable value of the compensable services.

Additionally, the jury found that Rischon incurred damages of $22,707 for out-of-pocket loss under the breach of contract, breach of partnership, breach of fiduciary duty, fraud, and negligent misrepresentation claims. The jury also found that $84,687 was a reasonable fee for Rischon's attorney. Rischon did not elect under which theory of recovery it wanted to recover, so the trial court entered a judgment for $22,707 for out-of-pocket damages and $84,687 in attorney's fees without referencing any theory of liability. Shafipour asserts eleven issues on appeal, while Rischon asserts five issues in its cross-appeal. We reverse and render judgment that Rischon take nothing.

## I. *Evidence at Trial*

Rischon's owner and president, John L. Hawkins, proposed a project to build duplex residences on a 7.6-acre tract of land that NMV owned.[1] Hawkins met with NMV's president (Shafipour) and its vice president (Mark Shafipour, Shafipour's son) in August 2005 to discuss the proposal. NMV's shareholders included Shafipour and his wife, who were the majority shareholders; their three daughters and one son, were each minority shareholders.

Hawkins proposed Rischon would coordinate the project, prepare the necessary documents, secure the required zoning variances and permits, secure construction financing, secure contractors, and complete construction. But Rischon had preconditions to the development plan: first, NMV had to sell the property to Rischon for $480,000, which was a price set by Rischon; second, NMV would provide seller financing for the purchase price; and third, NMV would have to agree to subordinate the property to Rischon's bank, Wachovia, who was to

---

[1] The property was not connected to the city's sewer system, was undeveloped land, and was not zoned for the proposed construction project; therefore, a variance would be necessary before the duplexes could be built.

2

provide Rischon a construction loan[2] for the project.[3]  Hawkins insisted this was "the only way the property could be developed" by Rischon and the only way the property could be sold.  Once the residences were completed, Rischon would market and sell the units as a subdivision or as individual parts of a subdivided tract.  Rischon and NMV would then split the remaining net profits evenly.[4]

Jonathon Aflatouni hosted a meeting between Shafipour, Mark Shafipour, and Hawkins.  Hawkins asserted that, at the meeting, Shafipour said that Hawkins's plan "was a good idea" and that "[h]e was ready to do it."  But Mark Shafipour testified that he had to translate conversations and documents for his father, who did not understand English well and could not read English.  Several witnesses also testified that Shafipour spoke and understood little English and did not read English, although others said he both spoke and understood English.  Hawkins admitted he had some trouble communicating with Shafipour.  Mark Shafipour also said that his father told him to tell Hawkins that the property was only for sale and "don't waste our time."  Nevertheless, Hawkins asserted that he left with an oral agreement between Rischon and Shafipour to jointly develop NMV's property.

Hawkins sent NMV a letter after the meeting[5] in which he represented what Hawkins called a "memorialization" of the agreement.[6]  In the letter, Hawkins

---

[2]Mark Shafipour testified that his father would have to sign the construction loan personally and personally guarantee that loan as well as be personally responsible for seller financing on the purchase price.

[3]Hawkins said that $5,000 would be deposited in an escrow account and that the remaining $35,000 would be paid at closing, which would leave a subordinated vendor's lien of $440,000 held by NMV.  But neither Hawkins nor Rischon ever deposited any money into an escrow account for the purchase of the property.

[4]In a subsequent letter to NMV, Hawkins outlined that whoever secured financing would keep sixty percent of the net profits.

[5]The letter is dated September 9, 2005, but the date of the meeting at Aflatouni's home is not clear.  It appears, however, that the meeting was sometime prior to the letter dated September 9, 2005.

[6]All documents drafted and sent to Shafipour were written in English.

outlined the proposed plan to build duplexes, the estimated cost to build, the sales price, and the expected net profits.[7] Neither Shafipour nor NMV responded to Rischon's letter; Shafipour asserted that he never received that letter or any other letters from Hawkins or Rischon.

Shafipour testified that NMV's property was for sale only and that he rejected Rischon's proposal. Mark Shafipour also attended the meeting and testified that he and his father rejected Rischon's proposal. Shafipour remarked that Rischon had merely conducted research, which would be part of due diligence, as part of a plan to purchase NMV's property. In contrast, Aflatouni testified that "all the parties were in agreement of the terms" of the proposal and said that, "since day one[,] [Rischon and Shafipour] were in total agreement on how the project [was] going to get done." But Hawkins admitted there were no written agreements.

Hawkins and Aflatouni drafted a sales contract, which listed NMV as the seller, to sell the property to Rischon; they included an agreement to use the property as collateral for a loan. Rischon forwarded the draft to NMV in late December 2005 or early January 2006, months after the first meeting. But this proposed sales contract did not list the legal description for the 7.6-acre property and, instead, listed an address in Haltom City that did not exist. Shafipour never signed any contract or agreement. In addition, Mark Shafipour, Farrukh Azim, Christine Rollins, and Philip Samples testified that Rischon's proposal to build duplexes near Section 8 housing, in an area that had become industrial in nature, was not economically feasible at an approximate sales price of $230,000 per double unit. Futhermore, the City of Haltom City had changed the zoning on the property.

---

[7]*See* Footnote No. 2.

Hawkins conceded at trial that he had been "working . . . towards" contracting with NMV. He claimed that Rischon had contracted or agreed with NMV, although nothing was "solidified." Hawkins expected a formal development or partnership agreement to eventually be created, once the project was "really moving." Despite not having any signed contract, Hawkins solicited bids for some basic work; submitted six preliminary plans to the city, all of which were rejected;[8] and even negotiated with a neighboring landowner to purchase a strip of land that he claimed was needed to complete the development.

Hawkins alleged that he worked hundreds of hours on the project, incurred expenses, and sent letters to Shafipour that outlined his expenses, progress, and strategies. But Hawkins never deposited any escrow money and never secured a signed sales contract. Hawkins's testimony indicated that he worked on the project and bought building plans from "PlanStyles" prior to any agreement with Shafipour; nonetheless, he expected to be paid for this work, even though he never secured approval from Haltom City for any plat or plan. Hawkins also admitted that he never paid the $6,000 for the property adjacent to the NMV property, which he claimed was needed for the project. Rischon elicited testimony that Shafipour had tried to find a builder to develop the property. NMV eventually sold the property to another as an undeveloped tract.

## II. *Issues Presented*

Shafipour contends in his first and second issues, respectively, that the statute of frauds barred Rischon's recovery because the agreement involved a sale of real property and because the contract was not performable in a year. In his third issue, he asserts that he was not the proper party to the suit. In his fourth

---

[8]Officials at Haltom City wrote a letter to Hawkins, in response to his third proposal, in which the city outlined in detail why that preliminary plan had been rejected. The officials told Hawkins to read all applicable building and zoning regulations and not to submit any plans that did not comply with those regulations.

through tenth issues, he challenges the legal and factual sufficiency of the evidence on all theories of liability. In his final issue, he maintains that Rischon was not entitled to recover attorney's fees because the fees awarded were excessive and were not segregated.

Rischon, in its first and second issues on cross-appeal, argues that, as a matter of law, it was entitled to attorney's fees for both the motion for new trial and the appeal, as well as attorney's fees through trial, in the amount of $93,237, rather than the $84,687 awarded. In its third and fourth issues, Rischon claims that, as a matter of law, it was entitled to lost profits of $300,000 and also was entitled to reimbursement for its time and expenses in the amount of $68,500 and $6,207.82, respectively. In its final issue, Rischon asserts that Shafipour's conduct was fraudulent, grossly negligent, and malicious.

III. *Standard of Review*

When we conduct a legal sufficiency review, we review the evidence in a light that tends to support the disputed finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). We "consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor." *In re Estate of Rhea*, 257 S.W.3d 787, 790 (Tex. App.—Fort Worth 2008, no pet.) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). If more than a scintilla of evidence supports the challenged finding, the no-evidence challenge must fail. *See Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the

6

evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)).

IV. *Discussion and Analysis*

We construe Shafipour's briefing to raise an initial question as to whether he can be held individually liable for acts that he undertook as an officer of NMV. Because Shafipour did not object to the jury charge, we must conduct our review based upon the jury charge that was given. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005). We will address the initial question first, followed by Shafipour's legal sufficiency challenges and then his attorney's fees issue.

A. *Issues III and VIII: Did Shafipour, motivated by personal interest, act in a manner so contrary to NMV's best interests that he is individually liable to Rischon?*

The jury charge included these questions: "Did Shafipour and Rischon agree to develop the Haltom City property?" and "Did Shafipour fail to comply with the agreement?" The jury answered "yes" to both questions. Shafipour argues that there was no evidence to show that he acted in any way other than as NMV's agent. He asserts that the evidence was legally and factually insufficient to show that he, individually, contracted with Rischon. Rischon contends that Hawkins's interaction with Shafipour, and its written correspondence, proves that it dealt with Shafipour as an individual and not as a corporate agent of NMV.

"A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations." *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). A corporation is a separate and distinct legal entity. *See Schlueter v.*

7

*Carey*, 112 S.W.3d 164, 169 (Tex. App.—Fort Worth 2003, pet. denied). Corporations, by their nature, cannot function without human agents. *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). A corporate officer's acts on the corporation's behalf are deemed corporate acts. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997) (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117–18 (Tex. 1996)). A corporate officer or director, who acts in good faith on the corporation's behalf, may not be held liable for inducing the corporation to violate a contractual obligation. *ACS Investors*, 943 S.W.2d at 432 (citing *Holloway*, 898 S.W.2d at 795).

The potential personal gain of a corporate officer is not determinative. *Holloway*, 898 S.W.2d at 796. Mixed motives where a corporate officer may himself benefit and the corporation may also benefit do not establish liability. *Kingston v. Helm*, 82 S.W.3d 755, 763 (Tex. App.—Corpus Christi 2002, pet. denied) (citing *Holloway*, 898 S.W.2d at 796; RESTATEMENT (SECOND) OF TORTS § 772 cmt. c. (1979) (it is immaterial that the corporate agent also profits)). "Instead, the plaintiff must show that the officer acted in a manner so contrary to the corporation's best interests that his or her actions could *only* have been motivated by personal interest." *Kingston*, 82 S.W.3d at 763 (emphasis added) (citing *Holloway*, 898 S.W.2d at 796).

Hawkins stated that the property that NMV owned could not be sold to anyone without developing it. He pitched Rischon's development plan and said that Shafipour agreed to have Rischon begin work. Hawkins said that the agreement was "stated in the letters." Rischon sent six letters from September 2005 to July 2006: three letters were addressed to Shafipour, as NMV's president, while three were addressed to him individually. Hawkins said that the first letter was a "memorialization" of the agreement. In the second letter, Rischon wrote that, "*[b]etween [Rischon] and NMV*, whichever party provides the interim bank

8

financing, for the duplex construction, that party receives sixty (60) percent of the final net profit" (emphasis added). Rischon's third letter, dated October 24, 2005, was addressed to "Shafipour, Pres." and Mark Shafipour of NMV; outlined a revised plan; and detailed various costs, a potential sales price, and proposed net profits of $825,000.

Rischon's final three letters were sent in December 2005, March 2006, and July 2006. Rischon sent the March 2006 letter after Aflatouni informed Hawkins that NMV was not going to sign the contract to sell the property. In that letter, Rischon proposed that NMV would be responsible for a majority of the development costs. The last letter Rischon sent, in July 2006, was a "DEMAND FOR PAYMENT" and was sent to Shafipour. In that letter, Rischon wrote, "By and through [Aflatouni], I represented your interests in an orderly development of the [property]. [Aflatouni] was aware of my representations to the City, from August, 2005 through March, 2006 and was involved every step of the way." Rischon also wrote in that letter, "[Shafipour] chose not to honor an agreement to subordinate the property to my construction loan, thereby eliminating any possibility I would have to obtain a loan from Wachovia."

Rischon's proposed sales contract was prepared for NMV's signature and listed NMV as the seller. The proposed contract for the sale of the property listed Aflatouni as an intermediary and as a broker for the seller, NMV.[9] Hawkins conceded at trial that he had been "working . . . towards" contracting with NMV. Hawkins said that the profits from the project would be split between Rischon and the "property owner," which was NMV. Hawkins, on Rischon's behalf, negotiated with NMV because it owned the property. *See Leitch*, 935 S.W.2d at 117–18. Any contract to buy had to be with NMV because Shafipour, as an individual, did

---

[9]The contract had a box checked that indicated that any agent involved, in this case Aflatouni, was an "intermediary." However, on the signature page of the contract, Aflatouni signed as "Principal Broker" for the seller, NMV.

not own the property. *See Pabich v. Kellar*, 71 S.W.3d 500, 506–07 (Tex. App.—Fort Worth 2002, pet. denied) (officer not liable, individually, for settlement agreement he signed as corporate agent); *Star Supply Co. v. Jones*, 665 S.W.2d 194, 198 (Tex. App.—San Antonio 1984, no writ) (corporate officer's signature on corporate contract does not render it his personal contract).

Hawkins, on Rischon's behalf, negotiated with NMV and attempted to contract with NMV, and Rischon cannot hold Shafipour, as a corporate officer of NMV, individually liable for the actions of NMV. *See John Masek Corp. v. Davis*, 848 S.W.2d 170, 174 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *see also Holloway*, 898 S.W.2d at 794 (holding that, "[b]ecause [plaintiff] presented no evidence that [defendant], *in his personal capacity*, willfully or intentionally interfered with the contract, we reverse the judgment of the court of appeals and render judgment that [plaintiff] take nothing"). In reviewing all evidence in favor of Rischon and disregarding all contrary evidence, we hold that there was no evidence that demonstrated Shafipour had acted in a manner so contrary to the best interests of NMV that he was motivated to advance *only* his personal interests. We sustain Shafipour's third and eighth issues.

*B. Issues IX and X: Promissory Estoppel and Quantum Meruit*

Shafipour asserts that he is not liable individually under a theory of promissory estoppel or quantum meruit. The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). Quantum meruit is an equitable theory of recovery that is based on an implied agreement to pay for benefits received by the person sought to be charged. *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). As we explained earlier, there is no evidence that Shafipour, as NMV's representative, acted in a manner so contrary to NMV's best interests that

Shafipour was only motivated by personal interests; thus, Shafipour cannot be held liable for actions he took as a corporate agent. *See ACS Investors*, 943 S.W.2d at 432.

But even if we are incorrect, there also is no evidence of reliance by Rischon or an unjust benefit being conferred by it on Shafipour, as an individual. Promissory estoppel requires proof of detrimental reliance. *English*, 660 S.W.2d at 524. Quantum meruit requires proof that the plaintiff provided valuable services or materials to the defendant, who accepted the services or materials under such circumstances as to be reasonably notified that the plaintiff, in performing, expected to be paid by the defendant. *Heldenfels Bros.*, 832 S.W.2d at 41.

Rischon required that NMV sell Rischon the property *before* development could begin: a precondition that required a signed real estate contract, which Rischon never secured from NMV. *See* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (West 2015); *Hooks v. Bridgewater*, 229 S.W. 1114, 1116 (Tex. 1921). The proposed contract for sale that Rischon sent NMV did not provide a legal description for the subject property, and NMV never signed it or any other contract to sell the 7.6-acre tract. There can be no reliance on a promise by Shafipour to develop a property that was never owned by Shafipour, individually. Likewise, there is no evidence that Hawkins provided valuable services to Shafipour because Hawkins never secured a zoning variance or an approval of any plat or plan from the city. Shafipour is not individually liable for actions he took on behalf of NMV when he negotiated with Rischon's agent, Hawkins, and refused to accept Rischon's proposals to buy the property or to pay for work Hawkins did that never resulted in a plat or plan approved by the city. We sustain Shafipour's ninth and tenth issues.

11

*C. Issues IV and V: Alleged Partnership and Presence of Fiduciary Duties*

In his fourth and fifth issues, Shafipour asserts that there was no evidence or that the evidence was factually insufficient to support a finding that there was a partnership between Rischon and Shafipour, individually; he argues that, without an enforceable agreement, he owed no fiduciary duty to Rischon and could not have breached one. The jury charge included the following question: "Did Shafipour and Rischon form a partnership for the real estate transaction?" The jury answered "yes." As we explain below, no evidence supported its answer.

*1. Formation of Partnership*

In its jury charge, the trial court outlined five factors that are used to determine whether a partnership exists. "[A]n association of two or more persons to carry on a business for profit as owners creates a partnership, whether the persons intend to create a partnership and whether the association is called a 'partnership,' 'joint venture,' or other name." *Long v. Lopez*, 115 S.W.3d 221, 223 n.2 (Tex. App.—Fort Worth 2003, no pet.) (alteration in original) (quoting former TEX. REV. CIV. STAT. art. 6132b-2.02(a)[10]). A partnership can be formed through written or oral agreement. *Id.* (citing former TEX. REV. CIV. STAT. art. 6132b-1.01(12)). Whether a partnership exists is to be determined by looking at the totality of the circumstances in regard to the five statutory factors. *Ingram v. Deere*, 288 S.W.3d 886, 891 (Tex. 2009). The five statutory factors are:

(1) receipt or right to receive a share of profits of the business;
(2) expression of an intent to be partners in the business;
(3) participation or right to participate in control of the business;

---

[10]Former Article 6132b was also known as the Texas Revised Partnership Act (TRPA). Although the TRPA expired on January 1, 2010, it was in effect during the events made the basis of this lawsuit, and we will apply its provisions to the alleged partnership at issue. *See* Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887 (former TEX. REV. CIV. STAT. art. 6132b); *see also* TEX. BUS. ORGS. CODE ANN. §§ 401.001, 402.001, 402.014 (West 2012).

12

(4) sharing or agreeing to share:
    (A) losses of the business; or
    (B) liability for claims by third parties against the business; and

(5) contributing or agreeing to contribute money or property to the business.

*Id.* at 895 (quoting former TEX. REV. CIV. STAT. art. 6132b-2.03(a)).

The trial court also instructed the jury that an agreement to share losses is not necessary to create a partnership. *See Ingram*, 288 S.W.3d at 902. Further, the trial court, in accordance with the TRPA, instructed the jury that a representation or other conduct indicating that a person is a partner with another person, if that is not the case, does not of itself create a partnership. *See* former TEX. REV. CIV. STAT. art. 6132b-3.06(a).

More than one factor is normally necessary to establish a partnership. *Ingram*, 288 S.W.3d at 904. A partnership is established as a matter of law if there is conclusive evidence of all five factors. *Id.* Conversely, no evidence of any of the factors will preclude the recognition of a partnership. *Id.* Partnership formation may be implied from the facts and circumstances of a case. *Elhamad v. Quality Oil Trucking Serv., Inc.*, No. 2-02-412-CV, 2003 WL 22211543, at *3 (Tex. App.—Fort Worth Sept. 25, 2003, no pet.) (mem. op.). Of the five factors, the first and third factors are the most important. *See Ingram*, 288 S.W.3d at 896.

     *a. Factors One and Three: Shared Profits and Right of Control*

Rischon required NMV to sell the property to it; this was the only way Rischon would agree to develop the property. Hawkins initially said that profits would be split evenly between Rischon and NMV, but Hawkins later proposed that Rischon would get sixty percent of the profits if it secured construction financing. Hawkins said that he completed more than 500 hours of work and incurred expenses, and he sought payment from NMV and, later, Shafipour. Hawkins

13

controlled the process of securing variances and permits, but he never secured approval from Haltom City for any plat or plan. He said that he sent Shafipour expense and progress reports on the work he did, which was work he controlled. Rischon and Aflatouni also drafted a sales contract, but neither NMV's representatives nor Shafipour, as an individual, ever signed it.

### b. *Factors Two and Five: Expression of Intent to be Partners and Make Contributions of Money or Property*

When we review the second factor on intent to be partners, we review the alleged partners' speech, writings, and conduct to guide our analysis. *Ingram*, 288 S.W.3d at 899. As to the fifth factor, an agreement to contribute or contributing money or property to the business, the definition of property includes "all property, real, personal, or mixed, tangible or intangible, or an interest in that property." *Id.* at 902 (quoting former TEX. REV. CIV. STAT. art. 6132b-1.01(15)) (internal quotation marks omitted).

Hawkins testified that Shafipour would provide the property to what Rischon claimed was their partnership because they referred to it as a partnership. But Rischon proposed a sale of the property from NMV, not Shafipour; Rischon's proposal was not for a transfer of Shafipour's interest in NMV to Rischon. Rischon asserted that its contribution was Hawkins's services, but Hawkins expected to be paid by NMV for his work. Rischon asserted that NMV was responsible for partnership expenses incurred and later claimed that NMV had reneged on its agreement to sell the property to Rischon. There is no evidence that Rischon actually contributed any money or other tangible property to the alleged partnership. Moreover, Hawkins conceded that nothing was "solidified." Finally, Hawkins said that he expected a formal partnership agreement to eventually be created once the project was "really moving." Therefore, the speech, writings, and conduct of Hawkins and Rischon only allow for one conclusion: Rischon intended

14

to partner, now or in the future, with NMV, the property owner, and not with Shafipour as an individual. *See Ingram*, 288 S.W.3d at 899.

### c. Factor Four: Agreement to Share Losses

In relation to the fourth factor, the absence of an agreement to share losses of the business is not dispositive of the issue as to the existence of the partnership, but "the existence of such an agreement could support [the] argument that a partnership existed." *Ingram*, 288 S.W.3d at 902. Rischon adduced no evidence to show the existence of an agreement to share losses or liability claims.

### 2. Summary of the Five Factors

Although there was some evidence that Rischon and NMV's representative may have agreed to share profits, there is no evidence that Rischon and Shafipour, individually, agreed to share profits, liability for claims, or losses. Rischon also never contributed money or other property to the alleged partnership. Furthermore, Rischon demanded that the property be sold to Rischon *before* development began. But NMV never signed the proposed sales contract sent by Rischon to NMV; Shafipour, individually, also did not sign it. Rischon may have intended to partner with NMV, although nothing was "solidified," but there is no evidence that Rischon partnered with Shafipour, individually. Because we hold there was no partnership agreement, we also hold there was no fiduciary relationship owed by Shafipour, individually, and no breach of any fiduciary duty by him. We sustain Shafipour's fourth and fifth issues.

### D. Issues I, VI, and VII: Statute of Frauds, Fraud, and Negligent Misrepresentation

Shafipour argues that the evidence was legally and factually insufficient to support a finding that he is liable under fraud and negligent misrepresentation theories. He also argues that the alleged agreement failed to comply with the statute of frauds. The jury charge contained the following questions: "Did

15

Shafipour commit fraud against Rischon?" and "Did Shafipour make a negligent misrepresentation on which Rischon relied?" The jury answered "yes" to both questions. Rischon asserts that the jury inferred that Shafipour committed fraud or negligent misrepresentation when Shafipour said he would develop the property with Rischon but never intended to do so. Rischon also asserts that the statute of frauds is not applicable.

A corporate officer can be held individually liable for his own fraudulent or tortious acts. *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). In an action seeking to hold an officer liable for his fraudulent statements, the corporate veil is not required to be pierced. *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App.—San Antonio 2003, pet. denied).

Both fraud and negligent misrepresentation require that the plaintiff show actual reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). And "[t]his reliance must be *reasonable and justified.*" *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 577 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (emphasis added) (quoting *Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, no pet.)) (internal quotation marks omitted); *see also BioSilk Spa, L.P. v. HG Shopping Ctrs., L.P.*, No. 14-06-00986-CV, 2008 WL 1991738, at *2 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied) ("Fraud [and] negligent misrepresentation . . . require reasonable and justified reliance upon a misrepresentation or promise.").

"In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Grant Thornton*, 314 S.W.3d at 923 (alteration in original) (quoting *Haralson v. E.F. Hutton Grp.*, 919 F.2d 1014, 1026 (5th Cir. 1990) (applying Texas law)). A plaintiff lacks justifiable

16

reliance if there are "red flags" that indicate such reliance is unwarranted. *Id.* (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (applying Texas law)).

In *Grant Thornton*, the court ruled that plaintiffs, bond and hedge funds, who had a sophisticated bond investor with a bachelor's degree in finance and master's degree in business administration on staff, could not have relied on representations about a company's source of credit funding contained in audit reports when the investor learned that the company's ability to access credit had been lost and the audit reports were inaccurate. *Grant Thornton*, 314 S.W.3d at 915–16, 923–24. Where the funds continued to purchase bonds knowing that the company lacked its primary source of credit, there could be no reliance. *Id.* at 923–24.

A plaintiff cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations. *Lewis*, 343 F.3d at 546–47. In *Lewis*, a plaintiff with a business background, access to professional accountants, familiarity with retirement accounts, knowledge of the amount of money involved in the proposed transaction, and knowledge of the ambiguous nature of the defendant's assurance of the tax consequences should have investigated the potential tax consequences of pledging retirement funds for collateral for a loan, rather than simply relying on an "oral assurance" made by the bank's loan officer, who was not an expert in tax law or investment planning. *Id.* Such reliance was not justified. *Id.*

Similar red flags put Rischon on notice not to proceed with Hawkins's work. Hawkins told Shafipour that "the *only way* the property could be developed" was for NMV to *sell* the property to Rischon and for NMV to *subordinate* the property so financing for development could be arranged. Rischon's own proposal

17

explicitly required NMV not only to agree to a sale for the price specified by Rischon, but also to agree to encumber the property with two loans *before* any development could begin. By these terms, these preconditions required writings signed by NMV to comply with the statute of frauds; an oral promise is insufficient. *See* BUS. & COM. § 26.01(a), (b)(4); *Hooks*, 229 S.W. at 1116. Rischon had no written contract signed by NMV for the sale of the real property owned by NMV. Absent a written sales contract to sell the property, signed by NMV, Rischon's claim of an alleged oral agreement with NMV or Shafipour is unenforceable. *See* BUS. & COM. § 26.01(a), (b)(4); *Hooks*, 229 S.W. at 1116.

In addition, Hawkins required Shafipour to personally guarantee all of the loans, but Shafipour did not execute any loan agreements. Hawkins claimed that Rischon had "contracted" with NMV, but neither NMV nor Shafipour ever signed a sales contract or any other agreement. Hawkins said he expected the *creation* of a formal development or partnership agreement once the project was "really moving," and he admitted nothing was "solidified." Hawkins testified that he had been in the construction and development business for fifty-two years and had done four developments. With Hawkins's background and experience and his full knowledge of the requirement that, *before* development could begin, NMV had to sell the property to Rischon, Rischon could not have relied on an oral representation by NMV or Shafipour to sell the property without a contract in place. Furthermore, because Rischon also required that NMV subordinate its interest in the vendor's lien to the construction loan and that Shafipour personally guarantee the construction loan, both of which required signed agreements by NMV and Shafipour, which never occurred, Rischon could not have relied on any oral representations by NMV or Shafipour to develop the property.

We also note that Rischon advanced an alternate theory of fraud on which it claims that the jury could have found Shafipour liable. As part of that theory of

fraud, Rischon had to prove, among other things, that Shafipour concealed or failed to disclose a material fact, that Rischon did not have the ability to discover the fact, and that such concealed or undisclosed fact induced Rischon to act. Because Rischon was the party that made the sale and subordination of the property necessary preconditions to development, the failure to execute those agreements was equally known, and thus equally discoverable, to both parties; therefore, there cannot be any fraud. *See Wortham v. Thompson*, 16 S.W. 1059, 1060 (Tex. 1891); *McCall v. Sullivan*, 1 White & W. 11 (Tex. Ct. App. 1876). We sustain Shafipour's first, sixth, and seventh issues.

    E. *Issue XI: Attorney's Fees*

Texas follows the "American Rule," which provides that "litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). Before a party is entitled to recover fees under Section 38.001 of the Texas Civil Practice and Remedies Code, the party must "prevail on a cause of action for which attorney's fees are recoverable." *Id.* Because we have held that Rischon cannot prevail and because there is no contract or statute that provides that either party is entitled to attorney's fees, Rischon is not entitled to attorney's fees. We sustain Shafipour's eleventh issue. We also overrule Rischon's issues on cross-appeal for an increase in the award of attorney's fees because we have held that Rischon is not entitled to attorney's fees.

Shafipour also pleaded for attorney's fees but failed to submit a jury question or secure a jury finding in its favor and did not raise or brief this issue on appeal; thus, it is waived. TEX. R. CIV. P. 279; TEX. R. APP. P. 33.1, 38.1; *Fuqua v. Oncor Elec. Delivery Co.*, 315 S.W.3d 552, 560 (Tex. App.—Eastland 2010, pet. denied) (issue not submitted to jury waived); *Bankhead v. Maddox*, 135 S.W.3d

19

162, 163 (Tex. App.—Tyler 2004, no pet.) (issues not raised or briefed on appeal are waived).

## *V. Conclusion*

We have reviewed the record and hold that there was legally insufficient evidence for the jury to award damages under any theory of liability. We sustain all of Shafipour's issues except for the second issue, which we do not need to reach. We also overrule Rischon's issues on attorney's fees and need not reach its remaining issues.

## *VI. This Court's Ruling*

We reverse the judgment of the trial court and render judgment that Rischon Development Corporation take nothing.

MIKE WILLSON
JUSTICE

May 29, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.