

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00003-CV

———————————————

CONESTOGA TRUST SERVICES, LLC, TRUSTEE OF CONESTOGA TRUST,
Appellant

V.

FOCUS MEDICAL UNDERWRITERS, LLC; MATTHEW L. RIOS, M.D.; SYED
FATEH HYDER, M.D.; CLARITY EVALUATIONS, LLC; TIMOTHY A. BESTE,
M.D.; BARRY COOK, M.D.; AND CONVERGENCE MEDICAL
UNDERWRITING, LLC, Appellees

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-308667-19

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Conestoga Trust Services, LLC, Trustee of Conestoga Trust (a third-party purchaser of life-insurance policies) appeals the summary judgment granted in favor of Appellees Focus Medical Underwriters, LLC; Matthew L. Rios, M.D.; Syed Fateh Hyder, M.D.; Clarity Evaluations, LLC; Timothy A. Beste, M.D.; Barry Cook, M.D.; and Convergence Medical Underwriting, LLC (who prepared life-expectancy reports that projected the life expectancies of the individuals insured under the life-insurance policies) on Conestoga's claims for fraud and negligent misrepresentation. In a single issue, Conestoga argues that fact issues exist regarding when it discovered or should have discovered that Appellees were intentionally providing materially false life-expectancy estimates and that Appellees failed to establish as a matter of law that Conestoga did not reasonably rely on the life-expectancy estimates prepared by Appellees. Because Appellees negated the reliance element—an element common to both Conestoga's fraud claim and its negligent-misrepresentation claim—we affirm the trial court's order granting Appellees' traditional summary-judgment motion.

## II. Factual and Procedural Background

### A. An Overview of the Life-Settlement Business

A life settlement involves the sale of an existing life-insurance policy by the original insured/owner to a life-settlement buyer. The original insured/owner benefits by selling the policy for more than its cash surrender value. For its part, the

buyer pays less than the policy's full death benefit to purchase the rights to the policy. Premiums are then paid by the buyer to keep the policy in force, and when the policy matures, the buyer (or whoever has been designated by the buyer) receives the policy's benefit. For an investor, the value of a life settlement is largely based on three factors: (1) the face amount of the policy (the death benefit); (2) the life expectancy of the insured; and (3) the premiums that will have to be paid to keep the policy in force. Because the return on a life-settlement investment depends on the insured's life expectancy and the date of the insured's death, the accuracy of a life-expectancy estimate is important. If the insured dies before his or her estimated life expectancy, the investor receives a higher return. If the insured lives longer than expected, the investor's return will be lower.

B. Michael McDermott's Involvement in the Life-Settlement Industry and His Introduction to Ronald James

The central players in this matter are Michael McDermott on behalf of Conestoga, and the person who was providing Conestoga with information—Ronald James. One company that was engaged in selling life settlements as investments was Retirement Value, LLC. Retirement Value sold its securities through a group of agents, whom it referred to as licensees. McDermott signed up as a licensee with Retirement Value in April 2009. While McDermott worked at Retirement Value, he

3

was introduced to Ronald James.[1]   Conestoga's brief states, "Conestoga's claims against James have been settled."  *See* Tex. R. App. P. 38.1(g) (stating that appellate court may accept as true facts in the brief unless contradicted by another party).  The James Defendants are not parties to this appeal.

### C.  McDermott's Formation of Conestoga and Conestoga's Relationship with James

In spring 2010, McDermott formed Conestoga Trust Services, LLC, which acted as the trustee of Conestoga Trust.  The role of the trust was to purchase certain life-insurance policies (that were acquired in life-settlement transactions) and to hold them for the benefit of investors who would be entitled to receive a certain fixed portion of the total death benefits payable under the policies in which such investors elected to participate.

The James Defendants were the exclusive source of the life-settlement policies for Conestoga, and all of the policies held by Conestoga were acquired from the James Defendants.  Pursuant to an agreement between the James Defendants and Conestoga, the James Defendants were responsible for conducting due diligence to vet the policies before offering them to Conestoga.  The James Defendants were also responsible for obtaining life-expectancy reports, but before agreeing to work with the James Defendants, McDermott insisted that the James Defendants could not obtain

---

[1]James operated James Settlement Services International, LLC and James Settlement Services, LLC (sometimes referred to herein as JSS).  We refer to James and his companies, collectively, as the James Defendants.

4

any life-expectancy estimates from Midwest Medical, which was a life-expectancy estimate provider that Retirement Value had used. The James Defendants were tasked with obtaining life-expectancy estimates from licensed, competent, trustworthy sources based on all relevant and available information and with providing to Conestoga the life-expectancy reports regarding the insureds on the policies that the James Defendants offered and sold to Conestoga.

The James Defendants, for their part, obtained a copy of each insured individual's medical records, contacted the life-expectancy estimate providers, and requested them to perform a medical review and to prepare a life-expectancy estimate. In this case, the James Defendants purchased from Appellees life-expectancy estimates (each of which included a disclaimer stating that the life expectancy was an estimate and was not a guarantee of the life expectancy of the insured) and provided them to Conestoga.

The James Defendants began presenting Conestoga with a portfolio of life-settlement policies to purchase in April 2010. Over the years that followed, Conestoga purchased numerous life-settlement policies from the James Defendants.

### D. Retirement Value Litigation

In May 2010, Retirement Value came under a court-ordered receivership pursuant to litigation filed by the Texas Attorney General's Office at the insistence of the Texas Securities Board (TSSB). The "Receiver's Third Amended Cross-Claim and Third-Party Claim" that was filed in August 2011 added JSS, James, and McDermott

as defendants. The receiver alleged that James had conceived the fraudulent and illegal investment scheme that was the subject of the suit, had talked a man into setting up Retirement Value, and had worked with him to design and implement the investment scheme to create a larger market in which the James Defendants could sell their policies. The receiver also alleged that Midwest Medical was creating unreliable life-expectancy estimates; that Midwest Medical's actual-to-expected performance was 42% (as compared to over 90% for other major life-expectancy estimate providers); and that James had used Midwest Medical's life-expectancy estimates, despite knowing that they were way below others in the industry, because his scheme would not have worked without the lower estimates from Midwest Medical. The receiver further alleged that McDermott was heavily involved in Retirement Value's marketing efforts, was thought of as part of Retirement Value's leadership, and was part of the initial due diligence performed by Retirement Value on Midwest Medical. McDermott settled the Retirement Value case in September 2012 for $750,000 and a commitment to cooperate with the TSSB.

## E.   Conestoga's Continued Relationship with James

Despite the Retirement Value suit, Conestoga did not cease doing business with the James Defendants. In early 2013, Conestoga received a communication by a third party accusing the James Defendants of pushing the use of life-expectancy reports created by Midwest Medical while at the same time James had life-expectancy estimates from others that were several times longer. The third party further asserted

that James had used the long life-expectancy estimates to purchase cheap and had sold the policies to Retirement Value at inflated prices by using shorter life-expectancy estimates produced by Midwest Medical. Conestoga forwarded the accusations to James and requested a response. James replied by denying everything and assuring Conestoga that he and his companies would do no such thing; specifically, James stated, "**WE DO NOT BUY POLICIES BASED ON LONG LE'S**[2] **AND SELL THEM AT SHORT LE'S**," and "**WE DO NOT PICK LE PROVIDERS**."

### F. The 2013 Press Release and the Change in Life-Expectancy Protocol

In May 2013, Conestoga circulated a press release entitled "Conestoga International Adopts New Life[-]Expectancy Protocol For Life Settlements" with the subheading "New Protocol Considers Actual Recorded Deaths from the Social Security Administration Tables." The press release states,

> Michael McDermott, President of Conestoga International LLC[] has announced that the company has changed its protocol for determining life expectancies on life[-]settlement policies purchased by the Conestoga Settlement Trust[] and made available as fractional interests to accredited investors[.]
>
> Conestoga made the decision to re-evaluate its life[-]expectancy protocol as a result of the recent turmoil in the life[-]expectancy prediction industry[:]

---

[2]Those in the industry often shorten the term "life expectancy" to LE. When such shorthand reference appears in quoted material, we will leave it unaltered.

7

- 21st Services, Inc[.,] a recognized life[-]expectancy provider, recently announced that it had made yet another major change in its methodology[;]
- AVS[,] another recognized life[-]expectancy provider, filed for bankruptcy[; and]
- Numerous lawsuits and regulatory actions have been filed against other life[-]settlement companies for allegedly manipulating life expectancies[.]

These developments and a corporate commitment to constantly strive to improve its product caused Conestoga to search for a more stable methodology to establish life expectancies for its portfolio of life[-]settlement policies[.]

Conestoga no longer relies solely on predictions from licensed life[-]expectancy providers. Rather, on all policies purchased for the portfolio and made available as fractional interests in life settlements to accredited investors, Conestoga includes life expectancies from the Social Security Administration Tables, based only on age and general statistics of longevity, without adjusting due to the impaired health of the insureds.

"Although this results in considerably longer life expectancies than companies who rely on underwritten life expectancies exclusively[] and requires that Conestoga escrow funds to pay premiums for longer periods of time, it was deemed necessary to offer life settlements that could better meet the expectations of our clients[,]" said Mr. McDermott[.]

"The life[-]expectancy[-]prediction industry has proven itself time-and-again to be an untested and imprecise science, at best[.]

"It is in the long-term interests of our clients to protect the value of life settlements based upon the stability of life[-]expectancy tables from the Social Security Administration—tables based upon actual, irrefutable results, rather than relying solely upon the constantly changing underwriting methodologies offered by recognized life[-]expectancy providers[.]"

Conestoga was already a leader in the industry in its handling of life expectancies prior to this announcement. By designating funds

necessary to pay premiums for up to three years beyond underwritten life expectancies, Conestoga set a new standard for protection against premium [costs] in the life[-]settlement industry[.]

Conestoga was created in 2010 with the goal to offer the safest and most transparent life settlements in the industry. Conestoga makes available fractional interests in life settlements to accredited investors in forty-seven states in the US, and abroad, from a portfolio of policies owned by the Conestoga Settlement Trust, currently valued at more than $100 [m]illion[.] [Emphasis added.]

## G.    Conestoga's Disclaimer Language

As part of its efforts to attract investors, Conestoga provided investors with Private Placement Memoranda, which indicated the nature of the investment being created and cautioned as to the risks of the investments. Conestoga's January 17, 2014 Private Placement Memoranda include the following caveats as to the life-expectancy estimates:

Conestoga purchases policies that have life[-]expectancy predictions from life[-]expectancy providers licensed and registered in Texas—one of the few states that require[s] life[-]expectancy providers to be registered. Average life expectancies are predicted by two licensed and registered independent life[-]expectancy underwriting companies[] or by a combination of an underwritten life expectancy and a life expectancy issued by the United States Social Security Administration. The Social Security Life[-]Expectancy Tables do not take into account an individual's personal health status[] but are based on the actual recorded deaths for millions of Americans. Conestoga does not represent that it is an expert in regard to life[-]expectancy reporting. Rather, Conestoga relies on life[-]expectancy estimates of registered life[-]expectancy providers supplied to Conestoga's source for its life[-]settlement insurance policies to estimate the maturity dates of its policies[] and on the information maintained by the United States Social Security Administration. *The accuracy of any life*[-]*expectancy estimates or medical information concerning an insured is not independently verified by Conestoga. Life expectancies are only forecasts of the expected mortality of an insured and are*

9

*inherently uncertain, especially in small sample sizes.  Inaccuracies are not only possible but expected both from estimates that are too long and estimates that are too short.*  Inaccuracies can result from inaccurate diagnoses[] or prognoses[;] changes in an insured's ability to fight disease[; and] reliance on outdated, inaccurate, improper, or flawed methodology, among other reasons.  In addition, improvements in medicine, disease treatment, pharmaceuticals, and other medical and health services may enable insured persons to live longer than expected.  *Conestoga makes no guarantee or assurance that any life[-]expectancy estimate obtained with respect to the expected maturity of a life[-]insurance policy will be accurate or correct.*  Rather, any mortality table or other actuarial data with respect to the insured person under such policy will only be an educated prediction of, and therefore not a guarantee of, the date of the future maturity of the policy. . . .

. . . .

*There is no guarantee or warranty implied in any [life-expectancy] estimate provided to Conestoga,* and such estimate does not constitute a recommendation of any nature.

### [ ]    No One Can Predict the Actual Life Expectancy of the Insured Person

When the life[-]insurance policies are made available for possible participation, Conestoga receives life[-]expectancy estimates on the insured persons from a qualified third-party life[-]expectancy provider.  *Any life[-]expectancy prediction is only an estimate of how long the insured person will live[] based on available medical and actuarial data.  No one can predict when an individual will die.*  Within a given set of life[-]insurance policies, there may be insured persons who die earlier than expected, other insured persons who die when expected, and still other insured persons who live much longer than expected.

. . . .

*Life expectancies and mortality estimates relied upon by independent life[-]expectancy providers are uncertain estimates only.*  There can be no assurance that the current mortality tables or other actuarial data relied upon will be predictive of the future longevity or the mortality of an insured. . . .

10

. . . .

Because no one can with certainty predict the date of death of the insured person, *life*[-]*expectancy predictions are only forecasts, projections, and estimates of the expected longevity of an insured and are inherently uncertain*, especially in small sample sizes. [Emphases added.]

## H. Conestoga's Intervention in the Georgia Suit Involving James Settlement Services International

As noted in Conestoga's 2013 press release, the life-settlement industry was replete with lawsuits, and the lawsuits did not cease. In 2017, James Settlement Services International sued an insurance broker, Eugene E. Houchins III, and others in the Northern District of Georgia (the *Houchins* suit). Conestoga intervened in the suit in 2018. In August 2019, Conestoga filed a motion for leave to file an amended complaint in intervention "to add allegations that James Settlement [had] fraudulently induced Conestoga to purchase [a life-insurance policy that was sold multiple times on the secondary market] by providing false and misleading information regarding the insured's life expectancy." Conestoga's amended complaint alleged that "[p]art of the due diligence and vetting that James Settlement [had] agreed to provide [Conestoga was] life[-]expectancy estimates on the insureds from licensed providers." Conestoga further alleged that "James Settlement intended to induce Conestoga to act upon the false and misleading representations as to [the insured's] life expectancy by buying the policy, and Conestoga did act in justifiable reliance upon the representations by buying the policy." McDermott gave a deposition in that suit and stated that he had trusted James to "basically choose good policies to put in the portfolio for Conestoga

11

to offer," that he (McDermott) had no relationship with the life-expectancy providers, that he had relied on James to provide life-expectancy providers, and that he did not educate himself about life-expectancy reports during that time "[b]ecause that was the responsibility of James Settlement Services."

## I.     The Investor Suit Against Conestoga

Conestoga did not remain immune from suit. When sued, it defended itself by relying on the inherent unreliability of life-expectancy estimates. In 2019, investors sued Conestoga and McDermott (as well as JSS) in the Northern District of Texas (the *Neukranz* suit). Two years later, Conestoga filed a motion to dismiss the investors' complaint, arguing that none of the investors had pleaded facts showing that their alleged reliance was justifiable. Specifically, Conestoga argued that "the allegations ignore almost all of what [the investors] were told about the estimates." Conestoga quoted the law regarding relying on representations when red flags are present: "[A] person 'may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted.'" McDermott filed a sworn affidavit in the case in which he noted, "As stated in the documentation provided to potential investors, each insured's life expectancy was an estimate, and the amount needed to pay the carrier to keep each policy in force over time was similarly an estimate. It is obviously not possible to guarantee an insured's life expectancy." McDermott also pointed out that "[a]ll Private Placement Memorand[a] ever used by Conestoga Trust very clearly informed potential investors . . . that forecasts of the expected mortality

12

of an insured are inherently uncertain and that no one can predict when an individual will die" and "that Conestoga Trust made no guarantee or assurance that any life[-]expectancy estimate obtained [would] be accurate or correct."

## J.     The Underlying Suit

In June 2019, Conestoga sued the James Defendants in the 141st District Court for various causes of action and sued Appellees for fraud and negligent misrepresentation based on the life-expectancy reports that they had prepared. Appellees answered with a general denial and pleaded various affirmative defenses, including the affirmative defense of statute of limitations and lack of justifiable reliance.[3]

Appellees filed a motion to dismiss under Texas Rule of Civil Procedure 91a, which permits summary dismissal as to pleaded claims that have no basis in law or fact. *See* Tex. R. Civ. P. 91a. The trial court granted the motion, and the case was appealed. *Conestoga Tr. Servs., LLC, Tr. of Conestoga Tr. v. Focus Med. Underwriters, LLC*, No. 14-20-00302-CV, 2022 WL 599344, at \*1 (Tex. App.—Houston [14th Dist.]

---

[3]As to the reliance element common to Conestoga's causes of action, Appellees argued that Conestoga could not reasonably or justifiably rely upon the life-expectancy reports prepared by Appellees because (1) Conestoga had prior knowledge of and had acknowledged negative acts and facts about the James Defendants, (2) Conestoga had decided as of May 2013 that the Social Security Administration Tables were more reliable predictors of life expectancy and had incorporated that information into its projections, and (3) Conestoga had arbitrarily added several years onto any life-expectancy estimates that it had received from the James Defendants in order to reduce the need to collect extra premium money from investors.

13

Mar. 1, 2022, no pet.) (mem. op.).[4] The Fourteenth Court of Appeals concluded that Conestoga had sufficiently pleaded actionable claims for fraud and negligent misrepresentation, reversed the trial court's dismissal order, and remanded for proceedings consistent with its opinion. *See id.* at *3.

On remand to the trial court, Appellees moved for traditional summary judgment on Conestoga's claims based on the affirmative defense of statute of limitations and lack of justifiable reliance.[5] Conestoga filed a response, Appellees filed a reply, and Conestoga filed a response to the reply. The trial court held a hearing on the summary-judgment motion. Afterward, the trial court rendered a summary-judgment order that does not state the ground on which it was granted. Conestoga perfected an appeal to challenge the summary-judgment order.

## III. Summary Judgment Was Proper

Conestoga argues in its sole issue that the trial court erred by granting Appellees' traditional motion for summary judgment. Conestoga challenges both grounds—statute of limitations and reliance—on which Appellees moved for

[4]Originally appealed to this court, the prior appeal was transferred to the Fourteenth Court of Appeals by the Texas Supreme Court pursuant to its docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001; *Conestoga Tr. Servs.*, 2022 WL 599344, at *1 n.2.

[5]Appellees initially filed a combined no-evidence and traditional motion for summary judgment. Later, the parties entered into a Rule 11 agreement that Appellees would amend their summary-judgment motion "to drop the no[-]duty argument and proceed on limitations and reliance." Appellees complied by filing an amended traditional motion for summary judgment that proceeded solely on limitations and lack of justifiable reliance.

14

summary judgment. Because we hold that Appellees conclusively established that Conestoga could not have justifiably relied on the life-expectancy reports due to numerous red flags that were present and that Conestoga did not come forward with competent controverting evidence that raises a fact issue on the element of reliance, we uphold the trial court's summary judgment in favor of Appellees.

## A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

15

**B. Applicable Law**

We begin by setting forth the elements of a fraud claim and a negligent-misrepresentation claim, noting the reliance element in each claim:

> To prevail on a fraud claim, a plaintiff must show[] (1) the defendant "made a material representation that was false[,"[6]] (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth[,]" (3) the defendant intended to induce the plaintiff to act upon the representation[,] and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (citing *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)). The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).

> To prevail on a cause of action for negligent misrepresentation, a plaintiff must show[] (1) a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest[,] (2) the representation conveyed "'false information' for the guidance of others in their business[,] (3) the defendant did not exercise

---

[6]The Texas Supreme Court has previously explained what constitutes a material representation:

> A representation is material if the representation was important to the plaintiff in making a decision, such that a reasonable person would be induced to act on and attach importance to the representation in making the decision. *See Italian Cowboy Partners*[*, Ltd. v. Prudential Ins. Co. of Am.*], 341 S.W.3d [323,] 337 [(Tex. 2011)] (citations omitted). The representation may be material even if it was not the only factor inducing the plaintiff[] to make the decision or enter into the transaction, **but the plaintiff must have relied on the misrepresentation**. *See Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 727–28 (Tex. App.—Waco 1998, pet. denied) (citations omitted).

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496–97 (Tex. 2019) (emphasis added in bold).

reasonable care or competence in obtaining or communicating the information[,] and (4) the plaintiff suffer[ed] pecuniary loss by justifiably relying on the representation." *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 199[1]).

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018). The Texas Supreme Court in *Orca Assets* expanded on the reliance element:

> Justifiable reliance . . . can be negated as a matter of law when circumstances exist under which reliance cannot be justified. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) . . . ("We hold that, as a matter of law, th[e] reliance was not justifiable."); *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.) (holding that reliance on a representation made in a business or commercial transaction can be unjustified as a matter of law).
>
> In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." *AKB*, 380 S.W.3d at 232. "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the protection of his own interests. . . . [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Westergren*, 453 S.W.3d at 425 (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). And when a party fails to exercise such diligence, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated." *See AKB*, 380 S.W.3d at 232. To this end, that party "cannot blindly rely on a representation by a defendant where the plaintiff's knowledge, experience, and background warrant investigation into any representations before the plaintiff acts in reliance upon those representations." *See Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.).

*Id.* at 654.

The Texas Supreme Court went on to explain how "red flags" can negate justifiable reliance:

In *Grant Thornton . . .* , we held that "a person may not justifiably rely on a misrepresentation if 'there are "red flags" indicating such reliance is unwarranted.'" 314 S.W.3d at 923 (quoting *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003)). In that case, investors claimed to have justifiably relied on certain representations when purchasing bonds from a corporation. *Id.* We held they could not have justifiably relied because before the acquisition, the investors' senior portfolio manager learned the corporation had lost its primary source of funding and was financially at risk. *Id.* Before reaching this conclusion, we noted that the portfolio manager was "an experienced bond investor" who held a finance degree and an MBA and who ultimately admitted the purchases "reflected a substantial risk." *Id.*

In adopting the "red[-]flags" impediment to justifiable reliance in *Grant Thornton*, we were persuaded by the Fifth Circuit's decision in *Lewis . . .* , 343 F.3d at 540. The Fifth Circuit analyzed the justifiable-reliance element as follows:

> Lewis, an individual with both a business background and familiarity with retirement accounts, should have viewed this series of events as a red flag warranting further investigation of the tax consequences of the loan transaction. Viewing the circumstances in their entirety, including Lewis's access to professional accountants, the amount of money involved in the transaction, and the ambiguous nature of [the defendant's] "assurance," Lewis's decision to enter into the transaction without undertaking additional investigation into its tax consequences was not justifiable.

*Id.* at 547 (footnote omitted).

*Id.* at 655.

## C. Analysis

### 1. Appellees negated the element of reliance as a matter of law.

Appellees argued in their summary-judgment motion that Conestoga was required to use due diligence to investigate the life-expectancy estimates before relying

18

on them and that Conestoga, as a savvy participant to an arm's-length transaction, should have recognized the many red flags indicating that reliance was not warranted. Specifically, Appellees contended that the following "red flags" precluded Conestoga from justifiably relying on the life-expectancy estimates:

- McDermott and James and JSS were [all] sued by the [r]eceiver for the TSSB in 2011 while McDermott was running Conestoga and buying policies from James and JSS. McDermott was made well aware of . . . James['s] being involved with and knowing about the background of Midwest Medical[, which] was manipulating life expectancies to make them shorter and more attractive to investors. McDermott and Conestoga continued buying life[-]insurance policies and obtaining LE reports from James and JSS after all the revelations in the [Retirement Value case].

- The [p]ress [r]elease, [which] McDermott made on behalf of Conestoga about the reliability of LE reports, . . . shows [that] McDermott and Conestoga were well aware of the unreliability of life[-]expectancy reports[ and] were aware of problems in the life[-]expectancy industry[,] which McDermott recited in his press release—the same issues flagged by the [r]eceiver in the [Retirement Value] case.

- The press release also shows that McDermott had performed some type of investigation or [had] read and [had] relied on a study and [had] concluded that Conestoga would no longer rely on LE reports because through his investigation, he had determined that [the] Social Security Administration Tables were more reliable.

- McDermott admitted in [his] deposition that he [had] arbitrarily added a few years to whatever average of LE expectancies James [had] provided him. He claims that the reason was to "better protect the investors[,]" but his press release admits that the Social Security Tables are longer and reduce the need for "premium calls[,"] i.e.[,] asking investors to put more money into a policy after they purchased it to keep the premiums paid and prevent

cancellation of the policy. McDermott's solution to simply add years to the expected life expectancy in order to cover potential extended premium payments was purely arbitrary. It had nothing to do with the accuracy of the life[-]expectancy projection; it had everything to do with adding years to the insured's life so they could collect the premium funds from investors instead of Conestoga['s] having to come out of pocket to pay the premiums. The press release was made at the latest by 2013. **Thus, [Conestoga] cannot prove critical elements of justifiable or reasonable reliance on anything regarding [Appellees'] life[-]expectancy reports.** [Exhibit references omitted.]

In addition to these red flags, Appellees noted in their summary-judgment motion that Conestoga had attempted to have "it both ways" with regard to due diligence: McDermott testified in his deposition that he had totally relied on JSS and had never bothered to educate himself on life expectancies, but

[h]e did in fact perform due diligence on [l]ife [e]xpectancies after he was sued in 2011 in the [Retirement Value] case and he did put out a press release in May 2013 that says he looked into life expectancies and he was aware of problems of reliability[,] . . . [so] he employed data from the . . . Social Security Administration Tables.

Appellees further argued that the life-expectancy reports contained disclaimers that the estimates were not guarantees and that "[n]o reasonable businessperson like McDermott in the business of buying and selling life settlements could receive a life[-]expectancy report and think an LE [p]rovider could precisely predict and promise that an individual would die on a date certain." Appellees noted that McDermott had acknowledged in his declaration from the *Neukranz* matter that life-expectancy projections are only estimates based on available information and that Conestoga had provided the same disclaimers in its Private Placement Memoranda.

20

To their summary-judgment motion, Appellees attached eighteen exhibits, spanning almost 500 pages.[7] Based on our review, the summary-judgment evidence establishes as a matter of law that Conestoga's alleged reliance on the life-expectancy estimates prepared by Appellees was not justified, as shown by the following:

- The "Receiver's Third Amended Cross-Claim and Third-Party Claim" that was filed in August 2011 in the Retirement Value case[8] stated that McDermott's involvement in Retirement Value "was pervasive," that he was thought of as part of Retirement Value's leadership, that he was heavily involved in Retirement Value's marketing efforts and created documents used to recruit licensees, that he was part of the initial due diligence performed by Retirement Value on Midwest Medical, that he was very aware of the questions raised by the SEC and others as to the reliability and honesty of Midwest Medical's life-expectancy projections, and that he and the James Defendants were engaged in a general scheme

---

[7]The record does not contain any objection from Conestoga related to Appellees' summary-judgment evidence.

[8]This pleading, and other pleadings mentioned below, were attached to Appellees' motion for summary judgment. *See generally Souder v. Cannon*, 235 S.W.3d 841, 848 (Tex. App.—Fort Worth 2007, no pet.) (noting that authenticated pleadings from other lawsuits are proper summary-judgment evidence).

21

(conceived by Ronald James)[9] to defraud investors by making false and misleading statement to the investors.

- The October 2018 "Complaint in Intervention of Conestoga Trust Services, LLC" and the August 2019 amended complaint in the *Houchins* suit stated that JSS was the exclusive agent and provider of life-settlement policies for Conestoga, that JSS had failed to conduct due diligence and properly vet the policies that it had provided Conestoga, and that JSS had fraudulently induced Conestoga to purchase a certain policy by providing false and misleading information regarding the insured's life expectancy.

- In spite of all the negative information that he had received about James, McDermott's deposition from August 2019 stated that he had trusted James "to basically choose good policies to put in the portfolio for Conestoga to offer" and that he had "relied totally on them," that James knew what kind of policies to look for because he had provided policies to Retirement Value, that McDermott had relied on JSS to provide life-expectancy estimates because he had no relationship with life-expectancy

---

[9]The pleading explains that JSS provided the life-expectancy calculations, which were calculated by Midwest Medical, and that Retirement Value and the James Defendants were fully aware that the Midwest Medical calculations were unreasonably optimistic—calculations by reputable underwriters were 180% longer than those calculated by Midwest Medical.

providers, that he averaged the life-expectancy estimates and the Social Security tables and then added another two and a half to three years, that he did not take any steps to educate himself about life-expectancy reports "[b]ecause that was the responsibility of James Settlement Services" and because he had "relied on their vast experience," that he had determined which policies to purchase based on the information that JSS had sent him regarding the policies, and that he had looked to James to provide the policies with accurate information.

- The motion to dismiss that Conestoga filed in June 2021 in the *Neukranz* suit instituted by investors (who alleged that the transaction documents, including the Private Placement Memoranda, that they were provided by Conestoga contained misrepresentations and omissions) emphasized that the investors were provided "*estimates* prepared by third-party professionals of how long the insureds were expected to live"; that the investors "[were] alleging fraud by hindsight" because some of the estimates that they were provided turned out to be incorrect; that the investors' complaint "ignore[d] 'red flags' in the transaction documents that directly refute[d]" their claims, including the wording of the Private Placement Memoranda that cautioned that "no one can with certainty predict the date of death of the insured person," "life[-]expectancy predictions are only . . . estimates of the expected longevity of an insured

23

and are inherently uncertain," and Conestoga made "no guarantee or assurance that any life[-]expectancy estimate obtained with respect to the expected maturity [of] a life[-]insurance policy [would] be accurate or correct"; and that the investors had alleged no facts that "ma[d]e it plausible that 'Conestoga' would have itself overpaid JSS for the same policies based on the same LE and premium estimates despite knowing those estimates were somehow 'false.'"[10]

- McDermott's declaration made in June 2021 in the *Neukranz* case stated that James was responsible for conducting due diligence to vet policies before offering them to Conestoga, that James was also responsible for calculating the minimum average cost of premium payments, that Conestoga relied on James's premium calculations, that James touted the accuracy and reliability of the premium calculations and sent an email to Conestoga stating that "JSS does not make mistakes[] with anything," that James was responsible for obtaining life-expectancy reports and for providing them to Conestoga, that Conestoga started averaging the life-expectancy estimates with the life-expectancy data provided by the Social Security Administration in 2013, and that Conestoga's documents stated

---

[10]Conestoga made this argument in its June 2021 motion to dismiss, despite Conestoga's having filed suit against Appellees based on the opposite of this contention in June 2019.

24

that the life expectancies were estimates only (as detailed in block quotes from the Private Placement Memoranda).

- Conestoga's January 17, 2014 Private Placement Memoranda (pertinent sections of which are quoted in the background section above) repeatedly described the life expectancies as estimates, forecasts, uncertain, inaccurate, and not guaranteed.

- The sworn declaration of the president of Appellee Clarity Evaluations stated that the life-expectancy estimates that it provided had disclaimers. The sample life-expectancy certificate prepared by Clarity and attached to the declaration included the following:

> **Disclaimers:** *A [l]ife [e]xpectancy cannot be precisely determined for any specific patient[] but rather is the average life expectancy of a large group of patients with similar clinical and individual profiles. No one can guarantee or warrant the accuracy of any patient's precise life expectancy. The information contained in this facsimile is privileged and confidential information for the use of the individual or entity named.*
>
> . . . .
>
> A Mortality Forecast is not a guarantee of the duration of the patient's life. It is the sum of medical and statistical analysis to provide the best prediction possible for that individual.
>
> This review was compiled solely for James Settlement Services, LLC and may not be used by any other company.

25

- The sworn declaration of the president of Appellee Convergence Medical Underwriting, LLC stated that the life-expectancy estimates that it provided all had disclaimers. The sample life-expectancy certificate prepared by Convergence and attached to the declaration included the following:

  > **Important:** Life[-e]xpectancy estimates are statistical averages based on the life expectancy of a large group of persons with similar individual[] and clinical[] analyses. Convergence Medical Underwriting, LLC does not represent that an insured will die on or near a projected date. There may be information that has not been provided to Convergence Medical Underwriting, LLC that may affect life expectancy. This report does not warrant or guarantee life expectancy.
  >
  > . . . Your state or the insured's state laws may prohibit you from making further disclosure without the expressed written consent of the person to whom it pertains. The information in this report is proprietary and may not be distributed to any other party without the expressed written consent of Convergence Medical Underwriting, LLC[] or the insured.

- The sworn declaration of the managing partner of Appellee Focus Medical Underwriters, LLC stated that the life-expectancy estimates that it provided all had disclaimers. The sample life-expectancy certificate prepared by Focus and attached to the declaration included the following:

  > Life [e]xpectancy is an estimation of the number of years that a person is expected to live based on statistical data of

the average life expectancy of a large group of persons with similar clinical and individual profiles. There is no guarantee or warrant[y] implied in this report[,] and [it] is an estimate only and does not constitute a recommendation of any nature.

. . . The information in this report is for the requesting party only and may not be distributed to any other party without the expressed written consent of Focus Medical Underwriters, LLC[] or the insured. This report is valid for 90 days from date of certificate.

Appellees' summary-judgment evidence established that Conestoga, through McDermott, was well acquainted with James's history of using fraudulent life-expectancy estimates; that despite this knowledge, Conestoga had still tasked James with hiring life-expectancy estimate providers for Conestoga and had relied solely on his claims of accuracy without performing any due diligence on the life-expectancy estimate providers; that Conestoga had started distrusting the life-expectancy estimates in 2013 and had begun averaging them with the Social Security Life-Expectancy Tables and then adding several years to that average; and that Conestoga had ignored the disclaimers for purposes of this suit but had touted them as its main defense for purposes of defending itself in the *Neukranz* suit.[11] As further stated by

---

[11]As part of its arguments responding to the no-justifiable-reliance ground, Conestoga argues in its brief that the trial court granted the summary judgment on grounds that were not before it. Specifically, Conestoga argues that based on the trial court's questioning at the hearing regarding the parties' lack of privity and the language in the life-expectancy reports, the trial court relied on disclaimer language from the life-expectancy reports that the information was for the requesting party only and could not be distributed without the life-expectancy estimate provider's consent. The trial court's questioning and statements during the hearing do not

27

Appellees, "[Conestoga] had overwhelming knowledge of facts that would make a

constitute evidence, nor do the court's comments alter our standard of review of the trial court's broadly worded summary-judgment order. *See generally Farmer v. State*, No. 2-06-113-CR, 2006 WL 3844169, at *4 n.8 (Tex. App.—Fort Worth Dec. 28, 2006, pet. ref'd) (mem. op., not designated for publication) ("We have reviewed the trial court's comments during the charge conference related to the sufficiency of the evidence and note that they are not evidence."). And we therefore do not rely on the comments in our analysis.

To the extent that Conestoga's argument can be broadly read as contending that the Rule 11 agreement removes the disclaimers from consideration, we disagree. The parties' Rule 11 agreement did not say that Appellees would not argue the disclaimers, only that they would not argue "no duty." Appellees made the following argument about the disclaimers in their amended traditional motion for summary judgment:

> Moreover, all of [Appellees'] [r]eports contain disclaimers of what a life expectancy is and is not, and they provide no guarantees. It is clear that [Conestoga] clearly read and understood the [r]eports and the disclaimers because [Conestoga] provided the same disclaimers about life[-]expectancy reports in their [Private Placement Memoranda] as the disclaimers [that Appellees] included in their reports. [Conestoga] knew that life expectancies were estimates and averages only based on statistical information of people with similar ages and conditions. LE reports do not contain promises of how long someone will live or when they will die. Conestoga understood this because they adopted the same type of disclaimers in their Private Placement Memorandum. [References to summary-judgment exhibits omitted.]

Conestoga filed a response to the reply stating that "[a]s agreed by the parties, [Appellees'] Amended MSJ omits entirely their previously asserted argument regarding whether [they] intended or expected the life expectancies to be relied on by persons such as Conestoga" and that "[Appellees'] Amended MSJ is solely a 'traditional' motion for summary judgment and omits entirely previously asserted 'no evidence' grounds." Conestoga thus agreed that Appellees' amended traditional summary-judgment motion complied with the Rule 11 agreement, despite containing arguments related to the disclaimers. Because the portion of the disclaimers—that the life-expectancy estimates provide no guarantees—is separate from the no-duty portion, we consider only the no-guarantee portion in our review of the summary-judgment evidence.

28

reasonable person [(1)] avoid doing any business with James and JSS and [(2)] if he is going to do business with JSS[,] he had plenty of knowledge to investigate the validity of the life expectancies." Viewing the circumstances in their entirety, including the numerous red flags listed above and McDermott's sophistication in the life-settlement industry in which he acquired a portfolio for Conestoga worth over $100 million, we conclude that Appellees presented summary-judgment evidence that conclusively negated Conestoga's justifiable reliance. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 501 (holding that there were sufficient red flags in the entirety of the circumstances to negate justifiable reliance).

### 2. Conestoga did not raise a fact issue on the reliance element.

The burden then shifted to Conestoga to come forward with competent controverting evidence that raises a fact issue. *See Phan Son Van*, 990 S.W.2d at 753. Conestoga argued in its response to Appellees' traditional summary-judgment motion and argues in its brief that Appellees' contention—that Conestoga could not have relied on the life-expectancy estimates because Conestoga knew that the estimates were inherently uncertain and were not guarantees of when an individual will die—is based on a mischaracterization of what constitutes a life expectancy in the life-settlement context and ignores the critical role that such estimates play in the context of buying and selling life settlements. Conestoga points to McDermott's declaration,

29

which is attached to Conestoga's response,[12] and urges that a "'life[-]expectancy [estimate] is always a significant component of the value of a life settlement'" and that life expectancy is "'the most important consideration in comparing the investment value of otherwise similar life settlements.'" Conestoga also quotes McDermott's statement that "'[j]ust because life[-]expectancy prediction is inherently imprecise hardly means life expectancies are not a critical component of life[-]settlement valuation.'"

With regard to Appellees' argument that Conestoga could not reasonably rely on the life-expectancy estimates prepared by Appellees because James was involved and had been previously accused of using improper life expectancies prepared by Midwest Medical, Conestoga responds that it had expressly prohibited James from using Midwest Medical and that it had *no reason* to doubt Appellees' integrity and qualifications; thus, Conestoga contends that Appellees "*point*[*ed*] *to no 'red flags' concerning . . . Appellees.*" Conestoga further points to McDermott's declaration in which he stated that he had relied on the life-expectancy estimates prepared by

---

[12]The other documents attached to Conestoga's response include a chart showing the purchase date of various life-insurance policies and the number of months the insured was expected to live as calculated by each of the life-expectancy providers (but not listing how long each insured actually lived), emails from 2014 between McDermott and James requesting that James send life-expectancy reports for new policies and attaching three life-expectancy certificates from Appellee Convergence, emails between McDermott and James in 2013 discussing the use of the Social Security mortality tables, and emails between McDermott and James regarding a policy that McDermott said that he did not want to buy to which James responded by lowering the price.

Appellees because he "did not have any training or expertise regarding the preparation of life expectancies or the use of mortality tables."

On the heels of this argument—that McDermott did not know how to use mortality tables—Conestoga responds to Appellees' argument that Conestoga had stopped relying on the life-expectancy estimates in 2013 and had begun using the Social Security Administration mortality tables. Conestoga contends that it did not stop using and relying on Appellees' life-expectancy estimates but rather added additional information—i.e., the data from the Social Security Administration mortality tables—to create a blended life expectancy. Conestoga quotes McDermott's declaration in which he stated that Conestoga had continued to "'constantly, expressly, and heavily rely on life expectancies [prepared] by [Appellees] . . . when deciding whether to buy . . . policies.'" Conestoga contends that the life-expectancy estimates prepared by Appellees continued to constitute a material component of the life expectancy it relied on.[13]

---

[13]In addition to the arguments that Conestoga raised in the trial court in response to the summary-judgment motion, Conestoga addresses the disclaimer argument for the first time on appeal. Conestoga contends that the "language used in the so-called 'disclaimers' was in fact part of . . . Appellees' effort[s] to make their life expectancies appear to be legitimate life expectancies" and that the "'disclaimers' [did] little more than define what a life expectancy is *supposed to be*." Conestoga further responds that Appellees' life-expectancy estimates were not statistical averages based on the life expectancy of a large group of persons with similar clinical and individual profiles but were instead purposefully, consistently, and materially shorter than they would have been if they were in fact statistical averages as stated in the disclaimers. However, "all theories in support of a summary judgment, as well as all opposing issues, must be presented in writing to the court at the hearing." *See Hearne v.*

31

In Appellees' reply to Conestoga's response to the summary-judgment motion, they argued that Conestoga failed to raise a genuine issue of material fact because (a) McDermott's self-serving declaration was not proper summary-judgment evidence[14] and (b) even if it were, McDermott's statements—asserting his "reliance" on the life-expectancy reports prepared by Appellees—even if true, are irrelevant in determining reliance in light of the disclaimers in the life-expectancy certificates, especially when Conestoga repeated the same language in its Private Placement Memoranda.[15]

---

*Riversource Life Ins. Co.*, No. 06-22-00046-CV, 2023 WL 3468315, at *10 n.12 (Tex. App.—Texarkana May 16, 2023, no pet. h.) (first citing *Casso v. Brand*, 776 S.W.2d 551, 553 (Tex. 1989); and then citing Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer[,] or other response shall not be considered on appeal as grounds for reversal.")). Because we may not reverse a trial court's summary judgment on issues not expressly presented to it in a written response and because Conestoga did not present summary-judgment evidence raising a genuine issue of material fact as to the red flags created by the disclaimers, we need not consider the arguments that Conestoga raised in its brief and in its reply brief related to the disclaimers. *See id.*; *see also* Tex. R. App. P. 47.1.

[14]Appellees filed an objection to Conestoga's summary-judgment evidence, seeking to have the trial court strike Conestoga's summary-judgment evidence in its entirety or to strike the specific paragraphs of McDermott's declaration cited in its objection (which included paragraphs 7, 8, 12–14, 16, and 18–26). The trial court overruled the objection.

[15]Conestoga filed an objection and response to Appellees' reply in which Conestoga complained that Appellees' reply violated the Rule 11 agreement by asserting no-duty arguments. Our analysis of the reliance element touches only on the portion of the disclaimers stating that the estimates are not guarantees; we do not delve into the disclaimers' statements regarding the intended recipient. We therefore do not set forth the no-duty arguments.

In its reply brief, Conestoga responds to Appellees' attacks on McDermott's declaration. Conestoga contends that "[a]lthough the declaration may be self-serving, it is <u>not</u> conclusory." Conestoga states that McDermott's declaration properly sets forth objective facts that could be readily controverted. Conestoga points to factual statements in McDermott's declaration that he did not have any training or expertise regarding the preparation of life expectancies or the use of mortality tables, that Conestoga did not have all medical records and other information that was available to and used by Appellees when they created the life-expectancy estimates, that Appellees were held out to Conestoga as being licensed in the State of Texas as life-expectancy providers and medical doctors who were properly qualified to prepare life-expectancy estimates, and that Conestoga was not aware of any reason to doubt Appellees' qualifications or integrity with regard to the life-expectancy estimates they prepared.

Viewing the evidence in the light most favorable to Conestoga, we conclude that Conestoga failed to raise a genuine issue of material fact. Conestoga's attempts to emphasize the materiality of the life-expectancy estimates does not eliminate its duty of due diligence. Conestoga claims that it took as gospel the life-expectancy reports from the life-expectancy providers selected by James despite knowing (1) his prior reputation for using life-expectancy providers that produced drastically low estimates and (2) the inherent unreliability of life-expectancy estimates generally. Conestoga was required to protect its investors through the exercise of ordinary care

33

and reasonable diligence, and such diligence was not excused by blindly relying on a disreputable party's selecting Appellees and by assuming that Appellees would provide honest and accurate estimates because James said they would. *See Orca Assets*, 546 S.W.3d at 654; *cf. Va. Oak Venture, LLC v. Fought*, 448 S.W.3d 179, 186–87 (Tex. App.—Texarkana 2014, no pet.) (stating that appellant's "argument is that she relied upon the lenders' reliance upon the appraiser" and that "[s]tretching reliance through another party in that fashion is not supported by the law"). The argument also ignores that Conestoga had reasons to know that James was a flawed conduit for information about life expectancies; he was accused of acting dishonestly in selecting the sources of information he had transmitted to prior life-settlement buyers. Rather than cease using a suspect conduit, Conestoga simply told James not to use Midwest Medical but to hire different life-expectancy providers and apparently expected that James would change his ways. Conestoga, in essence, argues that its admonition to James excused Conestoga from taking steps to confirm that he had mended his ways and from doing anything to verify that he was using reliable estimates. This appears to violate the principle of where fault lies for a party who has already been fooled once. Conestoga's decision to rely on the life-expectancy estimates without undertaking any investigation into the life-expectancy providers was not justifiable in light of the many red flags that were apparent and thus precludes Conestoga's claim of justifiable reliance as a matter of law. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 501; *Orca Assets*, 546 S.W.3d at 660.

### 3.    Disposition

Justifiable reliance is an essential element of each of Conestoga's remaining causes of action. *Orca Assets*, 546 S.W.3d at 653–54. Because we have determined that Appellees have established as a matter of law that Conestoga's alleged reliance on the life-expectancy estimates was not justified, we overrule Conestoga's sole issue.[16]

## IV.  Conclusion

Having overruled Conestoga's sole issue, we affirm the trial court's summary judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  June 29, 2023

---

[16]Because Appellees' conclusive negation of the reliance element defeats both of Conestoga's pleaded claims, we need not address the statute-of-limitations defense. *See* Tex. R. App. P. 47.1.